# ENVIRONMENTAL PROTECTION AGENCY ET AL.
## v. MINK ET AL.

No. 71–909.   Argued November 9, 1972—Decided January 22, 1973

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, and POWELL, JJ., joined. STEWART, J., filed a concurring opinion, *post*, p. 94. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 95. DOUGLAS, J., filed a dissenting opinion, *post*, p. 105. REHNQUIST, J., took no part in the consideration or decision of the case.

*Assistant Attorney General Cramton* argued the cause for petitioners. With him on the briefs were *Solicitor General Griswold, Acting Assistant Attorney General Wood, Harry R. Sachse, Walter H. Fleischer,* and *William Kanter.*

*Ramsey Clark* argued the cause and filed a brief for respondents.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The Freedom of Information Act of 1966, 5 U. S. C. § 552, provides that Government agencies shall make available to the public a broad spectrum of information, but exempts from its mandate certain specified categories of information, including matters that are "specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy," § 552 (b)(1), or are "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency," § 552 (b)(5). It is the construction and scope of these exemptions that are at issue here.

_____

*Briefs of *amici curiae* urging affirmance were filed by *Norman Dorsen, Melvin L. Wulf,* and *Sanford Jay Rosen* for the American Civil Liberties Union, and by *Marvin M. Karpatkin* and *Michael N. Pollet* for the Consumers Union of United States, Inc.

## I

Respondents' lawsuit began with an article that appeared in a Washington, D. C., newspaper in late July 1971. The article indicated that the President had received conflicting recommendations on the advisability of the underground nuclear test scheduled for that coming fall and, in particular, noted that the "latest recommendations" were the product of "a departmental under-secretary committee named to investigate the controversy." Two days later, Congresswoman Patsy Mink, a respondent, sent a telegram to the President urgently requesting the "immediate release of recommendations and report by inter-departmental committee . . . ." When the request was denied, an action under the Freedom of Information Act was commenced by Congresswoman Mink and 32 of her colleagues in the House.[1]

Petitioners immediately moved for summary judgment on the ground that the materials sought were specifically exempted from disclosure under subsections (b)(1) and (b)(5) of the Act.[2] In support of the motion, petitioners filed an affidavit of John N. Irwin II, the Under Secretary

---

[1] A separate action was brought to enjoin the test itself. *Committee for Nuclear Responsibility* v. *Seaborg* (DC, Civ. Action No. 1346–71). After adverse decisions below, plaintiffs in that case applied for an injunction in this Court. On November 6, 1971, we denied the application, *Committee for Nuclear Responsibility* v. *Schlesinger*, 404 U. S. 917, and the test was conducted that same day.

It should be noted that in the District Court respondents stated that they "have exhausted their administrative remedies [and] . . . have complied with all applicable regulations." Petitioners did not contest those assertions.

[2] Petitioners also moved for dismissal of the suit insofar as respondents sought disclosure of the documents in their official capacities as Members of Congress. The District Court granted this motion, but the Court of Appeals did not reach the issue. Accordingly, the issue is not before this Court.

of State. Briefly, the affidavit states that Mr. Irwin was appointed by President Nixon as Chairman of an "Under Secretaries Committee," which was a part of the National Security Council system organized by the President "so that he could use it as an instrument for obtaining advice on important questions relating to our national security." The Committee was directed by the President in 1969 "to review the annual underground nuclear test program and to encompass within this review requests for authorization of specific scheduled tests." Results of the Committee's reviews were to be transmitted to the President "in time to allow him to give them full consideration before the scheduled events." In ¶ 5 of the affidavit, Mr. Irwin stated that pursuant to "the foregoing directions from the President," the Under Secretaries Committee had prepared and transmitted to the President a report on the proposed underground nuclear test known as "Cannikin," scheduled to take place at Amchitka Island, Alaska. The report was said to have consisted of a covering memorandum from Mr. Irwin, the report of the Under Secretaries Committee, five documents attached to that report, and three additional letters separately sent to Mr. Irwin.[3] Of the

---

[3] According to the Irwin affidavit, the report contained the following documents:

A. A covering memorandum from Mr. Irwin to the President, dated July 17, 1971. This memorandum is classified Top Secret pursuant to Executive Order 10501.

B. The Report of the Under Secretaries Committee. This report was also classified Top Secret. Attached to the report were additional documents:

1. A letter, classified Secret, from the Chairman of the Atomic Energy Commission (AEC) to Mr. Irwin.

2. A report, classified Top Secret, from the Defense Program Review Committee, of which Dr. Henry Kissinger was the Chairman.

3. The Environmental Impact Statement on the proposed Cannikin test, prepared by the AEC in 1971, pursuant to § 102 (C) of the

total of 10 documents, one, an Environmental Impact Statement prepared by AEC, was publicly available and was not in dispute. Each of the other nine was claimed in the Irwin affidavit to have been

> "prepared and used solely for transmittal to the President as advice and recommendations and set forth the views and opinions of the individuals and agencies preparing the documents so that the President might be fully apprised of varying viewpoints and have been used for no other purpose."

In addition, at least eight (by now reduced to six) of the nine remaining documents were said to involve highly sensitive matter vital to the national defense and foreign policy and were described as having been classified Top Secret or Secret pursuant to Executive Order 10501.[4]

National Environmental Policy Act of 1969, 83 Stat. 853, 42 U. S. C. § 4332 (C). This document had always been "publicly available" and a copy was attached to the Irwin affidavit.

4. A transcript of an oral briefing given by the AEC to the Committee. This document was classified Secret.

5. A memorandum from the Council on Environmental Quality to Mr. Irwin. This memorandum was separately unclassified.

C. In addition to the covering memorandum and the Committee's report (with attached documents), were three letters that had been transmitted to Mr. Irwin:

1. A letter from Mr. William Ruckelshaus, for the Environmental Protection Agency. This letter was classified Top Secret, but has now been declassified.

2. A letter from Mr. Russell Train, for the Council on Environmental Quality. Although the Irwin affidavit states that this letter was classified Top Secret, petitioners concede that it was so classified "only because it was to be attached to the Undersecretary's Report." Brief for Petitioners 6 n. 5.

3. A letter of Dr. Edward E. David, Jr., for the Office of Science and Technology. This letter is classified Top Secret.

[4] These eight documents were also described as having been classified as "Restricted Data . . . pursuant to the Atomic Energy Act of 1954, as amended. (42 U. S. C. [§§ 2014 (y)], 2161 and 2162.)" Petitioners have not asserted that these provisions, standing alone,

On the strength of this showing by petitioners, the District Court granted summary judgment in their favor on the ground that each of the nine documents sought was exempted from compelled disclosure by §§ (b)(1) and (b)(5) of the Act. The Court of Appeals reversed, concluding that subsection (b)(1) of the Act permits the withholding of only the secret portions of those documents bearing a separate classification under Executive Order 10501: "If the nonsecret components [of such documents] are separable from the secret remainder and may be read separately without distortion of meaning, they too should be disclosed." 150 U. S. App. D. C. 233, 237, 464 F. 2d 742, 746. The court instructed the District Judge to examine the classified documents "looking toward their possible separation for purposes of disclosure or nondisclosure." *Ibid.*

In addition, the Court of Appeals concluded that all nine contested documents fell within subsection (b)(5) of the Act, but construed that exemption as shielding only the "decisional processes" reflected in internal Government memoranda, not "factual information" unless that information is "inextricably intertwined with policymaking processes." The court then ordered the District Judge to examine the documents *in camera* (including, presumably, any "nonsecret components" of the six classified documents) to determine if "factual data" could be separated out and disclosed "without impinging on the policymaking decisional processes intended to be protected by this exemption." We granted certiorari, 405 U. S. 974, and now reverse the judgment of the Court of Appeals.

---

would justify withholding the documents in this case. But see 5 U. S. C. § 552 (b)(3), relating to matters "specifically exempted from disclosure by statute."

## II

The Freedom of Information Act, 5 U. S. C. § 552,[5] is a revision of § 3, the public disclosure section, of the Administrative Procedure Act, 5 U. S. C. § 1002 (1964 ed.). Section 3 was generally recognized as falling far short of its disclosure goals and came to be looked upon more as a withholding statute than a disclosure statute. See S. Rep. No. 813, 89th Cong., 1st Sess., 5 (1965) (hereinafter S. Rep. No. 813); H. R. Rep. No. 1497, 89th Cong., 2d Sess., 5–6 (1966) (hereinafter H. R. Rep. No. 1497). The section was plagued with vague phrases, such as that exempting from disclosure "any function of the United States requiring secrecy in the public interest." Moreover, even "matters of official record" were only to be made available to "persons properly and directly concerned" with the information. And the section provided no remedy for wrongful withholding of information. The provisions of the Freedom of Information Act stand in sharp relief against those of § 3. The Act eliminates the "properly and directly concerned" test of access, stating repeatedly that official information shall be made available "to the public," "for public inspection." Subsection (b) of the Act creates nine exemptions from compelled disclosures. These exemptions are explicitly made exclusive, 5 U. S. C. § 552 (c), and are plainly intended to set up concrete, workable standards for determining whether particular material may be withheld or must be disclosed. Aggrieved citizens are given a speedy remedy in district courts, where "the court shall determine the matter de novo and the burden is on the agency to sustain its action." 5 U. S. C. § 552 (a)(3). Noncompliance with court orders may be punished by contempt. *Ibid.*

---

[5] The Act was passed in 1966, 80 Stat. 383, and codified in its present form in 1967. 81 Stat. 54.

Without question, the Act is broadly conceived. It seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands. Subsection (b) is part of this scheme and represents the congressional determination of the types of information that the Executive Branch must have the option to keep confidential, if it so chooses. As the Senate Committee explained, it was not "an easy task to balance the opposing interests, but it is not an impossible one either. . . . Success lies in providing a workable formula which encompasses, balances, and protects all interests, yet places emphasis on the fullest responsible disclosure." S. Rep. No. 813, p. 3.[6]

It is in the context of the Act's attempt to provide a "workable formula" that "balances, and protects all interests," that the conflicting claims over the documents in this case must be considered.

---

[6] The Report states (*ibid.*):

"It is the purpose of the present bill . . . to establish a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language . . . .

"At the same time that a broad philosophy of 'freedom of information' is enacted into law, it is necessary to protect certain equally important rights of privacy with respect to certain information in Government files, such as medical and personnel records. It is also necessary for the very operation of our Government to allow it to keep confidential certain material, such as the investigatory files of the Federal Bureau of Investigation.

"It is not an easy task to balance the opposing interests, but it is not an impossible one either. It is not necessary to conclude that to protect one of the interests, the other must, of necessity, either be abrogated or substantially subordinated. Success lies in providing a workable formula which encompasses, balances, and protects all interests, yet places emphasis on the fullest responsible disclosure."

See also H. R. Rep. No. 1497, p. 6.

## A

Subsection (b)(1) of the Act exempts from forced disclosure matters "specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy." According to the Irwin affidavit, the six documents for which Exemption 1 is now claimed were all duly classified Top Secret or Secret, pursuant to Executive Order 10501, 3 CFR 280 (Jan. 1, 1970). That order was promulgated under the authority of the President in 1953, 18 Fed. Reg. 7049, and, since that time, has served as the basis for the classification by the Executive Branch of information "which requires protection in the interests of national defense." [7] We do not believe that Exemption 1 permits compelled disclosure of documents, such as the six here that were classified pursuant to this Executive Order. Nor does the Exemption permit *in camera* inspection of such documents to sift out so-called "nonsecret components." Obviously, this test was not the only alternative available. But Congress chose to follow the Executive's determination in these matters and that choice must be honored.

The language of Exemption 1 was chosen with care. According to the Senate Committee, "[t]he change of standard from 'in the public interest' is made both to delimit more narrowly the exception and to give it a more precise definition. The phrase 'public interest' in section 3 (a) of the Administrative Procedure Act has been sub-

---

[7] Executive Order 10501 has been superseded, as of June 1, 1972, by Executive Order 11652, 37 Fed. Reg. 5209, which similarly provides for the classification of material "in the interest of the national defense or foreign relations."

Portions of two documents for which Exemption 1 is claimed were ordered disclosed in connection with the action brought to enjoin the test (see n. 1, *supra*). Petitioners seek no relief with respect to any matters already disclosed.

ject to conflicting interpretations, often colored by personal prejudices and predilections. It admits of no clear delineations." S. Rep. No. 813, p. 8. The House Committee similarly pointed out that Exemption 1 "both limits the present vague phrase, 'in the public interest,' and gives the area of necessary secrecy a more precise definition." H. R. Rep. No. 1497, p. 9. Manifestly, Exemption 1 was intended to dispel uncertainty with respect to public access to material affecting "national defense or foreign policy." Rather than some vague standard, the test was to be simply whether the President has determined by Executive Order that particular documents are to be kept secret. The language of the Act itself is sufficiently clear in this respect, but the legislative history disposes of any possible argument that Congress intended the Freedom of Information Act to subject executive security classifications to judicial review at the insistence of anyone who might seek to question them. Thus, the House Report stated with respect to subsection (b)(1) that "citizens both in and out of Government can agree to restrictions on categories of information which the President has determined must be kept secret to protect the national defense or to advance foreign policy, such as matters classified pursuant to Executive Order 10501." H. R. Rep. No. 1497, pp. 9–10.[8] Similarly, Representative

---

[8] The House Report, it is true, indicates that *the President* must determine that the exempted matter be kept secret. Clearly, however, Executive Order 10501 is based on presidential authority and specifically delegates that authority to "the departments, agencies, and other units of the executive branch *as hereinafter specified.*" 3 CFR § 281 (Jan. 1, 1970) (emphasis added). One may disagree with the scope of the delegation or with how the delegated authority is exercised in particular cases, but the authority itself nevertheless remains the President's and it is his judgment that the first exemption was designed to respect.

Moss, Chairman of the House Subcommittee that considered the bill, stated that the exemption "was intended to specifically recognize that Executive order [No. 10501]" and was drafted "in conformity with that Executive order." Hearings on Federal Public Records Law before a Subcommittee of the House Committee on Government Operations, 89th Cong., 1st Sess., 52, 55 (1965) (hereinafter 1965 House Hearings). And a member of the Committee, Representative Gallagher, stated that the legislation and the Committee Report make it "crystal clear that the bill in no way affects categories of information which the President . . . has determined must be classified to protect the national defense or to advance foreign policy. These areas of information most generally are classified under Executive Order No. 10501." 112 Cong. Rec. 13659.

These same sources make untenable the argument that classification of material under Executive Order 10501 is somehow insufficient for Exemption 1 purposes, or that the exemption contemplates the issuance of orders, under some other authority, for each document the Executive may want protected from disclosure under the Act. Congress could certainly have provided that the Executive Branch adopt new procedures or it could have established its own procedures—subject only to whatever limitations the Executive privilege may be held to impose upon such congressional ordering. Cf. *United States* v. *Reynolds,* 345 U. S. 1 (1953). But Exemption 1 does neither. It states with the utmost directness that the Act exempts matters "specifically required by Executive order to be kept secret." Congress was well aware of the Order and obviously accepted determinations pursuant to that Order as qualifying for exempt status under § (b)(1). In this context it is patently unrealistic to

argue that the "Order has nothing to do with the first exemption." [9]

What has been said thus far makes wholly untenable any claim that the Act intended to subject the soundness of executive security classifications to judicial review at the insistence of any objecting citizen. It also negates the proposition that Exemption 1 authorizes or permits *in camera* inspection of a contested document bearing a single classification so that the court may separate the secret from the supposedly nonsecret and order disclosure of the latter. The Court of Appeals was thus in error. The Irwin affidavit stated that each of the six documents for which Exemption 1 is now claimed "are and have been classified" Top Secret and Secret "pursuant to Executive Order No. 10501" and as involving "highly sensitive matter that is vital to our national defense and foreign policy." The fact of those classifications and the documents' characterizations have never been disputed by respondents. Accordingly, upon such a showing and in such circumstances, petitioners had met their burden of demonstrating that the documents were entitled to protection under Exemption 1, and the duty of the District Court under § 552 (a)(3) was therefore at an end.[10]

---

[9] Brief for Respondents 18. Respondents note that the preamble of the new Executive Order 11652 (see n. 7, *supra*), specifies that material classified pursuant to its provisions "is expressly exempted from public disclosure by Section 552 (b)(1) of Title 5, United States Code." Executive Order 10501 has no comparable recital, but only the sheerest ritualism would distinguish the effect of the two orders on any such basis. Indeed, respondents' apparent acceptance of the new order as a justifiable ground for resisting disclosure under Exemption 1 points to the absurdity of maintaining that Executive Order 10501 is irrelevant to the Act.

[10] This conclusion is not undermined by the new Executive Order 11652, which calls for the separation of documents into classified

## B

Disclosure of the three documents conceded to be "unclassified" is resisted solely on the basis of subsection (b)(5) of the Act (hereafter Exemption 5).[11] That Exemption was also invoked, alternatively, to support withholding the six documents for which Exemption 1 was claimed. It is beyond question that the Irwin affidavit, standing alone, is sufficient to establish that all of the documents involved in this litigation are "inter-agency or intra-agency" memoranda or "letters" that were used in the decisionmaking processes of the Executive Branch. By its terms, however, Exemption 5 creates an exemption for such documents only insofar as they "would not be available by law to a party . . . in litigation with the

---

and unclassified portions, where practicable. 37 Fed. Reg. 5212. On the contrary, that new order provides that the separating be done by the Executive, not the Judiciary, and, like its predecessor, permits declassification of material only in accordance with its procedures. More importantly, the very existence of the new order demonstrates that the Executive exercises a continuing responsibility for determining the need for secrecy in matters that affect national defense and foreign policy. Exemption 1 recognizes that responsibility by leaving to the Executive, under such orders as shall be developed, the decision of what may be disclosed and what must be kept secret.

[11] Title 5 U. S. C. § 552 reads in part as follows:

"(a) Each agency shall make available to the public information as follows:

.          .          .          .          .

"(b) This section does not apply to matters that are—

.          .          .          .          .

"(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."

The three documents are: the CEQ memorandum to Mr. Irwin, the Train letter, and the Ruckelshaus letter, which has now been declassified.

agency." This language clearly contemplates that the public is entitled to all such memoranda or letters that a private party could discover in litigation with the agency. Drawing such a line between what may be withheld and what must be disclosed is not without difficulties. In many important respects, the rules governing discovery in such litigation have remained uncertain from the very beginnings of the Republic.[12] Moreover, at best, the discovery rules can only be applied under Exemption 5 by way of rough analogies. For example, we do not know whether the Government is to be treated as though it were a prosecutor, a civil plaintiff, or a defendant.[13] Nor does the Act, by its terms, permit inquiry into particularized needs of the individual seeking the information, although such an inquiry would ordinarily be made of a private litigant. Still, the legislative history of Exemption 5 demonstrates that Congress intended to incorporate generally the recognized rule that "confidential intra-agency advisory opinions . . . are privileged from inspection." *Kaiser Aluminum & Chemical Corp.* v. *United States,* 141 Ct.

---

[12] See generally 4 J. Moore, Federal Practice ¶ 26.61 (1972) and authorities collected (*id.,* at ¶ 26.61 [1] n. 2) (hereinafter Moore); 8 J. Wigmore, Evidence §§ 2378, 2379 (McNaughton rev. 1961) (hereinafter Wigmore).

There were early disputes over the issue of Executive privilege. See Chief Justice Marshall's decisions in the trial of *United States* v. *Burr,* 25 F. Cas. 30 (No. 14,692d) and 25 F. Cas. 187, 191–192 (No. 14,694) (CCD Va. 1807), discussed in 8 Wigmore § 2371, pp. 739–741 (3d ed. 1940) and 4 Moore ¶ 26.61 [6.–4]. See also Wigmore § 2378, p. 805 and n. 21.

[13] Different rules have been held to apply in each situation. See, *e. g., United States* v. *Andolschek,* 142 F. 2d 503, 506 (CA2 1944) (L. Hand, J.) (United States as prosecutor); *Bank Line, Ltd.* v. *United States,* 76 F. Supp. 801 (SDNY 1948) (United States as defendant). Moreover, in actions under the Freedom of Information Act, courts are not given the option to impose alternative sanctions—short of compelled disclosure—such as striking a particular defense or dismissing the Government's action.

Cl. 38, 49, 157 F. Supp. 939, 946 (1958) (Reed, J.). As Mr. Justice Reed there stated:

"There is a public policy involved in this claim of privilege for this advisory opinion—the policy of open, frank discussion between subordinate and chief concerning administrative action." *Id.*, at 48, 157 F. Supp., at 946.

The importance of this underlying policy was echoed again and again during legislative analysis and discussions of Exemption 5:

"It was pointed out in the comments of many of the agencies that it would be impossible to have any frank discussion of legal or policy matters in writing if all such writings were to be subjected to public scrutiny. It was argued, and with merit, that efficiency of Government would be greatly hampered if, with respect to legal and policy matters, all Government agencies were prematurely forced to 'operate in a fishbowl.' The committee is convinced of the merits of this general proposition, but it has attempted to delimit the exception as narrowly as consistent with efficient Government operation." S. Rep. No. 813, p. 9.

See also H. R. Rep. No. 1497, p. 10. But the privilege that has been held to attach to intragovernmental memoranda clearly has finite limits, even in civil litigation. In each case, the question was whether production of the contested document would be "injurious to the consultative functions of government that the privilege of nondisclosure protects." *Kaiser Aluminum & Chemical Corp., supra.*, at 49, 157 F. Supp., at 946. Thus, in the absence of a claim that disclosure would jeopardize state secrets, see *United States* v. *Reynolds,* 345 U. S. 1 (1953), memoranda consisting only of compiled factual material

or purely factual material contained in deliberative memoranda and severable from its context would generally be available for discovery by private parties in litigation with the Government.[14] Moreover, in applying the privilege, courts often were required to examine the disputed documents *in camera,* in order to determine which should be turned over or withheld.[15] We must

---

[14] See, *e. g., Machin* v. *Zuckert,* 114 U. S. App. D. C. 335, 316 F. 2d 336, cert. denied, 375 U. S. 896 (1963) (Air Force Aircraft Accident Investigation Report); *Boeing Airplane Co.* v. *Coggeshall,* 108 U. S. App. D. C. 106, 112–113, 280 F. 2d 654, 660–661 (1960) (Renegotiation Board documents); *Olson Rug Co.* v. *NLRB,* 291 F. 2d 655, 662 (CA7 1961) (no claim that NLRB documents are "exclusively policy recommendations"); *Carl Zeiss Stiftung* v. *V. E. B. Carl Zeiss, Jena,* 40 F. R. D. 318, 327 (DC 1966), aff'd, 128 U. S. App. D. C. 10, 384 F. 2d 979, cert. denied, 389 U. S. 952 (1967) (discovery denied because documents "wholly of opinions, recommendations and deliberations"); *McFadden* v. *Avco Corp.,* 278 F. Supp. 57, 59–60 (MD Ala. 1967), and cases cited therein.

In *United States* v. *Cotton Valley Operators Comm.,* 9 F. R. D. 719, 720 (WD La. 1949), aff'd by equally divided court, 339 U. S. 940 (1950), the United States offered to file "an abstract of factual information" contained in the contested documents (FBI reports).

[15] See, *e. g., Machin* v. *Zuckert, supra,* ·at 340, 316 F. 2d, at 341 (private tort action; discovery of Air Force Aircraft Accident Investigation Report); *Boeing Airplane Co.* v. *Coggeshall, supra,* at 114, 280 F. 2d, at 662 (excess profits tax redetermination); *Olson Rug Co.* v. *NLRB, supra,* at 662 (discovery for use in defense against contempt proceedings); *O'Keefe* v. *Boeing Co.,* 38 F. R. D. 329, 336 (SDNY 1965) (private tort action; Air Force Investigation Reports); *Rosee* v. *Board of Trade,* 36 F. R. D. 684, 687–688 (ND Ill. 1965); *United States* v. *Cotton Valley Operators Comm., supra* (civil antitrust suit). Cf. *United States* v. *Procter & Gamble Co.,* 25 F. R. D. 485, 492 (NJ 1960) (criminal antitrust prosecution). See Wigmore § 2379, p. 812.

In *Kaiser Aluminum & Chemical Corp.* v. *United States,* 141 Ct. Cl. 38, 157 F. Supp. 939 (1958), where *in camera* inspection of a document was refused because of plaintiff's failure to make a

assume, therefore, that Congress legislated against the backdrop of this case law, particularly since it expressly intended "to delimit the exception [5] as narrowly as consistent with efficient Government operation." S. Rep. No. 813, p. 9. See H. R. Rep. No. 1497, p. 10. Virtually all of the courts that have thus far applied Exemption 5 have recognized that it requires different treatment for materials reflecting deliberative or policy-making processes on the one hand, and purely factual, investigative matters on the other.[16]

Nothing in the legislative history of Exemption 5 is contrary to such a construction. When the bill that ultimately became the Freedom of Information Act,

definite showing of necessity, *id.*, at 50, 157 F. Supp., at 947, the "objective facts" contained in the disputed document were "otherwise available." *Id.*, at 48–49, 157 F. Supp., at 946.

[16] See, *e. g., Soucie* v. *David*, 145 U. S. App. D. C. 144, 448 F. 2d 1067 (1971); *Grumman Aircraft Eng. Corp.* v. *Renegotiation Bd.*, 138 U. S. App. D. C. 147, 151, 425 F. 2d 578, 582 (1970); *Bristol-Myers Co.* v. *FTC*, 138 U. S. App. D. C. 22, 424 F. 2d 935 (1970); *International Paper Co.* v. *FPC*, 438 F. 2d 1349, 1358–1359 (CA2), cert. denied, 404 U. S. 827 (1971); *General Services Admin.* v. *Benson*, 415 F. 2d 878 (CA9 1969), *aff'g* 289 F. Supp. 590 (WD Wash. 1968); *Long Island R. Co.* v. *United States*, 318 F. Supp. 490, 499 n. 9 (EDNY 1970); *Consumers Union* v. *Veterans Admin.*, 301 F. Supp. 796 (SDNY 1969), appeal dismissed as moot, 436 F. 2d 1363 (CA2 1971); *Olsen* v. *Camp*, 328 F. Supp. 728, 731 (ED Mich. 1970); *Reliable Transfer Co.* v. *United States*, 53 F. R. D. 24 (EDNY 1971).

The proposed Federal Rules of Evidence appear to recognize this construction of Exemption 5. Proposed Rule 509 (a) (2) (A) defines "official information" to include "intragovernmental opinions or recommendations submitted for consideration in the performance of decisional or policymaking functions." Rule 509 (c) further provides that "[i]n the case of privilege claimed for official information the court may require examination *in camera* of the information itself."

S. 1160, was introduced in the 89th Congress, it contained an exemption that excluded:

"inter-agency or intra-agency memorandums or letters dealing solely with matters of law or policy." [17]

This formulation was designed to permit "[a]ll *factual* material in Government records . . . to be made available to the public." S. Rep. No. 1219, 88th Cong., 2d Sess., 7 (1964). (Emphasis in original.) The formulation was severely criticized, however, on the ground that it would permit compelled disclosure of an otherwise private document simply because the document did not deal "solely" with legal or policy matters. Documents dealing with mixed questions of fact, law, and policy would inevitably, under the proposed exemption, become available to the public.[18] As a result of this criticism,

---

[17] Hearings on S. 1160, S. 1336, S. 1758, and S. 1879 before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 89th Cong., 1st Sess., 7 (1965) (hereinafter 1965 Senate Hearings). This exemption itself had been broadened during its course through the Senate in the 88th Congress. The exemption originally applied only to internal memoranda "relating to the consideration and disposition of adjudicatory and rulemaking matters." Section 3 (c) of S. 1666, 88th Cong., 2d Sess. (1964), introduced in 110 Cong. Rec. 17086. That early formulation came under attack for not sufficiently protecting material dealing with general policy matters not directly related to adjudication or rulemaking. See Hearings on S. 1666 and S. 1663 before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 88th Cong., 1st Sess., 202–203. 247 (1963).

[18] See 1965 Senate Hearings 36, 94–95, 112–113, 205, 236–237, 244, 366–367, 382–383, 402–403, 406–407, 417, 437, 445–446, 450, 490. See 1965 House Hearings 27–28, 49, 208, 220, 223–224, 229–230, 245–246, 255–257. Examples of these many statements are:

Federal Aviation Administration (1965 Senate Hearings 446):

"Few records would be entirely devoid of factual data, thus leaving papers on law and policy relatively unprotected. Staff

Exemption 5 was changed to substantially its present form. But plainly, the change cannot be read as suggesting that *all* factual material was to be rendered exempt from compelled disclosure. Congress sensibly discarded a wooden exemption that could have meant disclosure of manifestly private and confidential policy recommendations simply because the document containing them also happened to contain factual data. That decision should not be taken, however, to embrace an equally wooden exemption permitting the withholding of factual material otherwise available on discovery merely because it was placed in a memorandum with matters of law, policy, or opinion. It appears to us that Exemption 5 contemplates that the public's access to internal memoranda will be governed by the same flexible, commonsense approach that has long governed private parties' discovery of such documents involved in litigation with Government agencies. And, as noted, that approach extended and continues to extend to the discovery of purely factual material appearing in those documents in a form that is severable without compromising the private remainder of the documents.

Petitioners further argue that, although *in camera* inspection and disclosure of "low-level, routine, factual reports" [19] may be contemplated by Exemption 5, that type of document is not involved in this case. Rather,

---

working papers and reports prepared for use within the agency of the executive branch would not be protected by the proposed exemptions."

Department of Commerce (1965 Senate Hearings 406):

"Under this provision, internal memorandums dealing with *mixed questions of fact, law and policy* could well become public information." (Emphasis in original.)

[19] Tr. of Oral Arg. 23.

it is argued, the documents here were submitted directly to the President by top-level Government officials, involve matters of major significance, and contain, by their very nature, a blending of factual presentations and policy recommendations that are necessarily "inextricably intertwined with policymaking processes." 150 U. S. App. D. C., at 237, 464 F. 2d, at 746. For these reasons, the petitioners object both to disclosure of any portions of the documents and to *in camera* inspection by the District Court.

To some extent, this argument was answered by the Court of Appeals, for its remand expressly directed the District Judge to disclose only such factual material that is not "intertwined with policymaking processes" and that may safely be disclosed "without impinging on the policymaking decisional processes intended to be protected by this exemption." We have no reason to believe that, if petitioners' characterization of the documents is accurate, the District Judge would go beyond the limits of the remand and in any way compromise the confidentiality of deliberative information that is entitled to protection under Exemption 5.

We believe, however, that the remand now ordered by the Court of Appeals is unnecessarily rigid. The Freedom of Information Act may be invoked by any member of "the public"—without a showing of need—to compel disclosure of confidential Government documents. The unmistakable implication of the decision below is that any member of the public invoking the Act may require that otherwise confidential documents be brought forward and placed before the District Court for *in camera* inspection—no matter how little, if any, purely factual material may actually be contained therein. Exemption 5 mandates no such result. As was said in

*Kaiser Aluminum & Chemical Corp.,* 141 Ct. Cl., at 50, 157 F. Supp., at 947: "It seems . . . obvious that the very purpose of the privilege, the encouragement of open expression of opinion as to governmental policy is somewhat impaired by a requirement to submit the evidence even [*in camera*]." Plainly, in some situations, *in camera* inspection will be necessary and appropriate. But it need not be automatic. An agency should be given the opportunity, by means of detailed affidavits or oral testimony, to establish to the satisfaction of the District Court that the documents sought fall clearly beyond the range of material that would be available to a private party in litigation with the agency. The burden is, of course, on the agency resisting disclosure, 5 U. S. C. § 552 (a)(3), and if it fails to meet its burden without *in camera* inspection, the District Court may order such inspection. But the agency may demonstrate, by surrounding circumstances, that particular documents are purely advisory and contain no separable, factual information. A representative document of those sought may be selected for *in camera* inspection. And, of course, the agency may itself disclose the factual portions of the contested documents and attempt to show, again by circumstances, that the excised portions constitute the barebones of protected matter. In short, *in camera* inspection of all documents is not a necessary or inevitable tool in every case. Others are available. Cf. *United States* v. *Reynolds,* 345 U. S. 1 (1953). In the present case, the petitioners proceeded on the theory that all of the nine documents were exempt from disclosure in their entirety under Exemption 5 by virtue of their use in the decisionmaking process. On remand, petitioners are entitled to attempt to demonstrate the propriety of withholding any documents, or portions

thereof, by means short of submitting them for *in camera* inspection.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE STEWART, concurring.

This case presents no constitutional claims, and no issues regarding the nature or scope of "Executive privilege." It involves no effort to invoke judicial power to require any documents to be reclassified under the mandate of the new Executive Order 11652. The case before us involves only the meaning of two exemptive provisions of the so-called Freedom of Information Act, 5 U. S. C. § 552.

My Brother DOUGLAS says that the Court makes a "shambles" of the announced purpose of that Act. But it is Congress, not the Court, that in § 552 (b)(1) has ordained unquestioning deference to the Executive's use of the "secret" stamp. As the opinion of the Court demonstrates, the language of the exemption, confirmed by its legislative history, plainly withholds from disclosure matters "specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy." In short, once a federal court has determined that the Executive has imposed that requirement, it may go no further under the Act.

One would suppose that a nuclear test that engendered fierce controversy within the Executive Branch of our Government would be precisely the kind of event that should be opened to the fullest possible disclosure consistent with legitimate interests of national defense. Without such disclosure, factual information available to the concerned Executive agencies cannot be considered

by the people or evaluated by the Congress. And with the people and their representatives reduced to a state of ignorance, the democratic process is paralyzed.

But the Court's opinion demonstrates that Congress has conspicuously failed to attack the problem that my Brother DOUGLAS discusses. Instead, it has built into the Freedom of Information Act an exemption that provides no means to question an Executive decision to stamp a document "secret," however cynical, myopic, or even corrupt that decision might have been.

The opinion of my Brother BRENNAN dissenting in part makes an admirably valiant effort to deflect the impact of this rigid exemption. His dissent focuses on the statutory requirement that "the court shall determine the matter de novo . . . ." But the only "matter" to be determined *de novo* under § 552 (b) (1) is whether in fact the President has required by Executive Order that the documents in question are to be kept secret. Under the Act as written, that is the end of a court's inquiry.*

As the Court points out, "Congress could certainly have provided that the Executive Branch adopt new procedures or it could have established its own procedures— subject only to whatever limitations the Executive privilege may be held to impose upon such congressional ordering." But in enacting § 552 (b) (1) Congress chose, instead, to decree blind acceptance of Executive fiat.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, concurring in part and dissenting in part.

The Court holds today that the Freedom of Information Act, 5 U. S. C. § 552, authorizes the District

---

*Similarly rigid is § 552 (b) (3), which forbids disclosure of materials that are "specifically exempted from disclosure by statute." Here, too, the only "matter" to be determined in a district court's *de novo* inquiry is the factual existence of such a statute, regardless of how unwise, self-protective, or inadvertent the enactment might be.

Court to make an *in camera* inspection of documents claimed to be exempt from public disclosure under Exemption 5 of the Act. In addition, the Court concludes that, as an exception to this rule, the Government may, in at least some instances, attempt to avoid *in camera* inspection through use of detailed affidavits or oral testimony. I concur in those aspects of the Court's opinion. In my view, however, those procedures should also govern matters for which Exemption 1 is claimed, and I therefore dissent from the Court's holding to the contrary. I find nothing whatever on the face of the statute or in its legislative history that distinguishes the two Exemptions in this respect, and the Court suggests none. Rather, I agree with my Brother Douglas that the mandate of § 552 (a)(3)—"the court shall determine the matter de novo and the burden is on the agency to sustain its action"—is the procedure that Congress prescribed for both Exemptions.

The Court holds that Exemption 1 immunizes from judicial scrutiny any document classified pursuant to Executive Order 10501, 3 CFR 280 (Jan. 1, 1970).[1] In reaching this result, however, the Court adopts a construction of Exemption 1 that is flatly inconsistent with the legislative history and, indeed, the unambiguous language of the Act itself.[2] In plain words, Exemption 1 exempts from disclosure only material *"specifically required* by Executive order to be kept secret *in the interest of the national defense or foreign policy."* (Emphasis

---

[1] Executive Order 10501 was revoked on March 8, 1972, and replaced with Executive Order 11652, 37 Fed. Reg. 5209, which became effective June 1, 1972.

[2] "The policy of the Act requires that the . . . exemptions [be construed narrowly]." *Soucie* v. *David,* 145 U. S. App. D. C. 144, 157, 448 F. 2d 1067, 1080 (1971). "A broad construction of the exemptions would be contrary to the express language of the Act." *Wellford* v. *Hardin,* 444 F. 2d 21, 25 (CA4 1971).

added.)  Executive Order 10501, however, which was promulgated 13 years before the passage of the Act, does not require that any *specific* documents be classified. Rather, the Executive Order simply delegates the right to classify to agency heads, who are empowered to classify information as Confidential, Secret, or Top Secret.  Thus, the classification decision is left to the sole discretion of these agency heads.  Moreover, in exercising this discretion, agency heads are not required to examine each document separately to determine the need for secrecy but, instead, may adopt *blanket* classifications, without regard to the content of any particular document.  Thus, as §§ 3 (b) and 3 (c) of the Order make clear, matters for which there is no need for secrecy "in the interest of the national defense or foreign policy" may be indiscriminately classified in conjunction with those matters for which there is a genuine need for secrecy:

> 3 (b)  *"Physically Connected Documents.*  The classification of a file or group of physically connected documents shall be at least as high as that of the most highly classified document therein. Documents separated from the file or group shall be handled in accordance with their individual defense classification."

> 3 (c)  *"Multiple Classification.*  A document, product, or substance shall bear a classification at least as high as that of its highest classified component. The document, product, or substance shall bear only one over-all classification, notwithstanding that pages, paragraphs, sections, or components thereof bear different classifications."

Even the petitioners concede,[3] no doubt in response to the "specifically required" standard of § 552 (b)(1)

---

[3] Petition for Cert. 9 n. 4.

and the "specifically stated" requirement of § 552 (c),[4] that documents classified pursuant to § 3 (b) of Executive Order 10501 cannot qualify under Exemption 1. Indeed, petitioners apparently accept the conclusion of the Court of Appeals that as to § 3 (b):

> "This court sees no basis for withholding on security grounds a document that, although separately unclassified, is regarded secret merely because it has been incorporated into a secret file. To the extent that our position in this respect is inconsistent with the above-quoted paragraph of Section 3 of Executive Order 10501, we deem it required by the terms and purpose of the [Freedom of Information Act], enacted subsequently to the Executive Order." 150 U. S. App. D. C., at 236, 464 F. 2d, at 745.

---

[4] Section 552 (c) provides:

"This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section. This section is not authority to withhold information from Congress."

The accompanying Senate Report emphasizes that § 552 (c) places a heavy burden on the Government to justify nondisclosure:

"The purpose of [§ 552 (c)] is to make it clear beyond doubt that all materials of the Government are to be made available to the public by publication or otherwise unless *explicitly* allowed to be kept secret by one of the exemptions in [§ 552 (b)]." S. Rep. No. 813, 89th Cong., 1st Sess., 10 (1965) (emphasis added).

A commentator cogently argues that the "pull of the word 'specifically' [in § 552 (c)] is toward emphasis on [the] statutory language" of the nine stated exemptions. The "specifically stated" clause in § 552 (c), he notes, "is often relevant in determining the proper interpretation of particular exemptions." K. Davis, Administrative Law § 3A.15, p. 142 (Supp. 1970). See also Davis, The Information Act: A Preliminary Analysis, 34 U. Chi. L. Rev. 761 (1967).

For a detailed study of the Freedom of Information Act and its background, see Note, Comments on Proposed Amendments to Section 3 of the Administrative Procedure Act: The Freedom of Information Bill, 40 Notre Dame Law. 417 (1965).

Nevertheless, petitioners maintain that information classified pursuant to § 3 (c) of the Order is exempt from disclosure under Exemption 1. The Court of Appeals rejected that contention, and in my view, correctly. The Court of Appeals stated:

"The same reasoning applies to this provision as to the one dealing with physically-connected documents. Secrecy by association is not favored. If the non-secret components are separable from the secret remainder and may be read separately without distortion of meaning, they too should be disclosed." 150 U. S. App. D. C., at 237, 464 F. 2d, at 746.

Petitioners' argument, adopted by the Court, is that this construction of the Act imputes to Congress an intent to authorize judges independently to review the Executive's decision to classify documents in the interest of the national defense or foreign policy. That argument simply misconceives the holding of the Court of Appeals. Information classified pursuant to § 3 (c), it must be emphasized, may receive the stamp of secrecy, not because such secrecy is necessary to promote "the national defense or foreign policy," but simply because it constitutes a part of such other information which genuinely merits secrecy. Thus, to rectify this situation, the Court of Appeals ordered only that the District Court *in camera* determine "[i]f the non-secret components are separable from the secret remainder and may be read separately without distortion of meaning . . . ." The determination whether any components are in fact "non-secret" is left exclusively to the agency head representing the Executive Branch. The District Court is not authorized to declassify or to release information that the Executive, in its sound discretion, determines must be classified to "be kept secret in the interest of the national defense or

foreign policy." [5]  The District Court's authority stops with the inquiry whether there are components of the documents that would not have been independently classified as secret.  If the District Court finds, on *in camera* inspection, that there are such components, and that they can be read separately without distortion of meaning, the District Court may order their release.  The District Court's authority to make that determination is unambiguously stated in § 552 (a)(3): "the [district] court shall determine the matter de novo and the burden is on the agency to sustain its action."  The Court's contrary holding is in flat defiance of that congressional mandate. [6]

Indeed, only the Court of Appeals' construction is consistent with the congressional plan in enacting the Freedom of Information Act.  We have the word of both Houses of Congress that the *de novo* proceeding requirement was enacted expressly "in order that the ultimate decision as to the propriety of the agency's action is made by the court and prevent it from becoming meaningless judicial sanctioning of agency discretion."  S. Rep. No. 813, 89th Cong., 1st Sess., 8 (1965) (hereinafter cited as S. Rep. No. 813); H. R. Rep. No. 1497, 89th Cong., 2d Sess., 9 (1966) (hereinafter cited as H. R. Rep. No. 1497). What was granted, and purposely so, was a broad grant

---

[5] See Developments in the Law—The National Security Interest and Civil Liberties, 85 Harv. L. Rev. 1130, 1224–1225 (1972).

[6] "[G]iven the requirement that a file or document is generally classified at the highest level of classification of any information enclosed, it will often be the case that a classified file will contain information that could be released separately to the public.  Because it is not 'specifically required by Executive order to be kept secret,' such information is not privileged under the Information Act.  To ensure that an overall classification is not being used to protect unprivileged papers, a reviewing court should inspect the documents sought by a litigant."  Developments in the Law, *supra*, n. 5, at 1223.

to the District Court of "authority whenever it considers such action equitable and appropriate to enjoin the agency from withholding its records and to order the production of agency records improperly withheld." H. R. Rep. No. 1497, p. 9. And to underscore its meaning, Congress rejected the traditional rule of deference to administrative determinations by "[p]lacing the burden of proof upon the agency" to justify the withholding. S. Rep. No. 813, p. 8; H. R. Rep. No. 1497, p. 9. The Court's rejection of the Court of Appeals' construction is inexplicable in the face of this overwhelming evidence of the congressional design.

The Court's reliance on isolated references to Executive Order 10501 in the congressional proceedings is erroneous and misleading. The Court points to a single passing reference to the Order in the House Report, which even a superficial reading reveals to be merely suggestive of the kinds of information that the Executive Branch might classify. Nothing whatever in the Report even remotely implies that the Order was to be recognized as immunizing from public disclosure the entire file of documents merely because one or even a single paragraph of one has been stamped secret. The Court also calls to its support some comments out of context of Congressmen Moss and Gallagher on the House floor. But on their face, these comments do no more than confirm that Exemption 1 was written with awareness of the existence of Executive Order 10501. Certainly, whatever significance may be attached to debating points in construing a statute,[7] these comments hardly support the Court's conclusion that a classification pursuant to Executive Order 10501, without more, immunizes an entire document from disclosure under Exemption 1.

---

[7] See *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S. 384, 395, 397 (1951) (Jackson, J., concurring) (Frankfurter, J., dissenting).

Executive Order 10501 was promulgated more than a decade before the Freedom of Information Act was debated in Congress. Yet, no reference to the Order can be found in either the language of the Act or the Senate Report. Under these circumstances, it would seem odd, to say the least, to attribute to Congress an intent to incorporate "without reference" Executive Order 10501 into Exemption 1. Indeed, petitioners' concession that "physically connected documents," classified under § 3 (b) of the Order, are not immune from judicial inspection serves only to reinforce the conclusion that the mere fact of classification under § 3 (c) cannot immunize the identical documents from judicial scrutiny.

The Court's rejection of the Court of Appeals' construction of Exemption 1 is particularly insupportable in light of the cogent confirmation of its soundness supplied by the Executive Branch itself. In direct response to the Act, Order 10501 has been revoked and replaced by Order 11652, which expressly requires classification of documents in the manner the Court of Appeals required the District Court to attempt *in camera.* The Order, which was issued on March 8, 1972, and became effective on June 1, 1972, 37 Fed. Reg. 5209 (Mar. 10, 1972), explicitly attributes its form to the Executive's desire to accommodate its procedures to the objectives of the Freedom of Information Act:

> "The interests of the United States and its citizens are best served by making information regarding the affairs of Government readily available to the public. This concept of an informed citizenry is reflected in the Freedom of Information Act and in the current public information policies of the executive branch."

Moreover, in his statement accompanying the promulgation of the new Order, the President stated: "The Executive order I have signed today is based upon . . .

a reexamination of the rationale underlying the Freedom of Information Act." 8 Presidential Documents 542 (Mar. 13, 1972).

The new Order recites that *"some* official information and material . . . bears directly on the effectiveness of our national defense and the conduct of our foreign relations" and that *"[t]his* official information or material, referred to as classified information or material in this order, is expressly exempted from public disclosure by Section 552 (b)(1) of [the Freedom of Information Act]." (Emphasis added.) Thus, the Executive clearly recognized that Exemption 1 applies only to matter *specifically* classified "in the interest of the national defense or foreign policy." And in an effort to comply with the Act's mandate that genuinely secret matters be carefully separated from the nonsecret components, § 4 (A) of the new Order provides:

> *"Documents in General.* Each classified document shall . . . to the extent practicable, be so marked as to indicate which portions are classified, at what level, and which portions are not classified in order to facilitate excerpting and other use."

The President emphasized this requirement in his statement:

> "A major source of unnecessary classification under the old Executive order was the practical impossibility of discerning which *portions* of a classified document actually required classification. Incorporation of any material from a classified paper into another document usually resulted in the classification of the new document, and *innocuous portions of neither paper could be released."* 8 Presidential Documents 544 (Mar. 13, 1972) (emphasis added).

It is of course true, as the Court observes, that the Order "provides that the separating be done by the Ex-

ecutive, not the Judiciary . . . ." *Ante,* at 85 n. 10. But that fact lends no support to a construction of Exemption 1 precluding judicial inspection to enforce the congressional purpose to effect release of nonsecret components separable from the secret remainder. Rather, the requirement of judicial inspection, made explicit in § 552 (a)(3), is the keystone of the congressional plan, expressly deemed "essential in order that the ultimate decision as to the propriety of the agency's action is made by the court [to] prevent it from becoming meaningless judicial sanctioning of agency discretion." S. Rep. No. 813, p. 8; H. R. Rep. No. 1497, p. 9. It could not be more clear, therefore, that Congress sought to make certain that the ordinary principle of judicial deference to agency discretion was discarded under this Act. The Executive was not to be allowed "to file an affidavit stating [the] conclusion [that documents are exempt] and by so doing foreclose any other determination of the fact." *Cowles Communications* v. *Department of Justice,* 325 F. Supp. 726, 727 (ND Cal. 1971). Accord, *Frankel* v. *SEC,* 336 F. Supp. 675, 677 n. 4 (SDNY 1971), rev'd on other grounds, 460 F. 2d 813 (CA2 1972); *Philadelphia Newspapers* v. *HUD,* 343 F. Supp. 1176, 1180 (ED Pa. 1972).[8]

---

[8] In support of their claim that Executive Order 10501 automatically and without judicial review activates the exemption of § 552 (b)(1), petitioners rely upon *Epstein* v. *Resor,* 421 F. 2d 930 (CA9 1970). Rather, *Epstein* confirms the Court of Appeals' interpretation of the Act. The *Epstein* court refused a request to review *in camera* documents classified pursuant to Executive Order 10501, but only because the Government, at the plaintiff's request, had begun a current review of the documents on "a paper-by-paper basis." Moreover, in response to the argument that petitioners advance here—namely, that the mere classification of a document precludes judicial review—*Epstein* states:

"[I]n view of the legislative purpose to make it easier for private citizens to secure Government information, it seems most unlikely that [the Act] was intended to foreclose an (a)(3) judicial review

The Court's interpretation of Exemption 1 as a complete bar to judicial inspection of matters claimed by the Executive to fall within it wholly frustrates the objective of the Freedom of Information Act. That interpretation makes a nullity of the Act's requirement of *de novo* judicial review. The judicial role becomes "meaningless judicial sanctioning of agency discretion," S. Rep. No. 813, p. 8; H. R. Rep. No. 1497, p. 9, the very result Congress sought to prevent by incorporating the *de novo* requirement.

MR. JUSTICE DOUGLAS, dissenting.

The starting point of a decision usually indicates the result. My starting point is what I believe to be the philosophy of Congress expressed in the Freedom of Information Act, 5 U. S. C. § 552.

Henry Steele Commager, our noted historian, recently wrote:

> "The generation that made the nation thought secrecy in government one of the instruments of Old World tyranny and committed itself to the principle that a democracy cannot function unless the people are permitted to know what their government is up to. Now almost everything that the Pentagon and the CIA do is shrouded in secrecy. Not only are the American people not permitted to know what they are up to but even the Congress and, one suspects, the President [witness the 'unauthorized' bombing of the North last fall and winter] are kept in darkness." The New York Review of Books, Oct. 5, 1972, p. 7.

---

of the circumstances of exemption. Rather it would seem that [subsection] (b) was intended to specify the basis for withholding under (a)(3) and that judicial review de novo with the burden of proof on the agency should be had as to whether the conditions of exemption in truth exist." 421 F. 2d, at 932–933.

Two days after we granted certiorari in the case on March 6, 1972, the President revoked the old Executive Order 10501 and substituted a new one, Executive Order 11652, dated March 8, 1972, and effective June 1, 1972. The new Order states in its first paragraph that: "The interests of the United States and its citizens are best served by making information regarding the affairs of Government readily available to the public. This concept of an informed citizenry is reflected in the Freedom of Information Act and in the current public information policies of the Executive branch."

While "classified information or material" as used in the Order is exempted from public disclosure, § 4 of the Order states that each classified document shall "to the extent practicable, be so marked as to indicate which portions are classified, at what level, and which portions are not classified in order to facilitate excerpting and other use." § 4 (A). And it goes on to say: "Material containing references to classified materials, which references do not reveal classified information, shall not be classified." *Ibid.*

The Freedom of Information Act does not clash with the Executive Order. Indeed, the new Executive Order precisely meshes with the Act and with the construction given it by the Court of Appeals. Section 552 (a)(3) of the Act gives the District Court "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." Section 552 (a)(3) goes on to prescribe the procedure to be employed by the District Court. It says "the court shall determine the matter de novo and the burden is on the agency to sustain its action."

The Act and the Executive Order read together mean at the very minimum that the District Court has power

to direct the agency in question to go through the suppressed document and make the portion-by-portion classification to facilitate the excerpting as required by the Executive Order.  Section 552 (a)(3) means also that the District Court may in its discretion collaborate with the agency to make certain that the congressional policy of disclosure is effectuated.

The Court of Appeals, in an exceedingly responsible opinion, directed the District Court to proceed as follows:

Where material is separately *unclassified* but nonetheless under the umbrella of a "secret" file, the District Court should make sure that it is disclosed under the Act.  This seems clear from § 552 (b) which states: "This section does not apply to matters that are—(1) specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy." Unless the *unclassified* appendage to a "secret" file falls under some other exception in § 552 (b) it seems clear that it must be disclosed.  The only other exception under which refuge is now sought is subsection (b)(5) which reads that the section does not apply to "interagency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."

This exemption was described in the House Report as covering "any internal memorandums which would routinely be disclosed to a private party through the discovery process in litigation with the agency."  H. R. Rep. No. 1497, 89th Cong., 2d Sess., 10.  It is clear from the legislative history that while opinions and staff advice are exempt, factual matters are not.  *Ibid.;* S. Rep. No. 813, 89th Cong., 1st Sess., 9.  And the courts have uniformly agreed on that construction of the Act.  See *Soucie* v. *David,* 145 U. S. App. D. C. 144, 448 F. 2d 1067; *Grumman Aircraft Eng. Corp.* v. *Renegotiation Bd.,* 138 U. S.

App. D. C. 147, 425 F. 2d 578; *Long Island R. Co.* v. *United States,* 318 F. Supp. 490; *Consumers Union* v. *Veterans Admin.,* 301 F. Supp. 796.

Facts and opinions may, as the Court of Appeals noted, be "inextricably intertwined with policymaking processes" in some cases. In such an event, secrecy prevails. Yet, where facts and opinions can be separated, the Act allows the full light of publicity to be placed on the facts.

Section 552 (c) seems to seal the case against the Government when it says: "This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section." Disclosure, rather than secrecy, is the rule, save for the specific exceptions in subsection (b).

The Government seeks to escape from the Act by making the Government stamp of "Top Secret" or "Secret" a barrier to the performance of the District Court's functions under § 552 (a)(3) of the Act. The majority makes the stamp sacrosanct, thereby immunizing stamped documents from judicial scrutiny, whether or not factual information contained in the document is in fact colorably related to interests of the national defense or foreign policy. Yet, anyone who has ever been in the Executive Branch knows how convenient the "Top Secret" or "Secret" stamp is, how easy it is to use, and how it covers perhaps for decades the footprints of a nervous bureaucrat or a wary executive.

I repeat what I said in *Gravel* v. *United States,* 408 U. S. 606, 641–642 (dissenting opinion):

> "[A]s has been revealed by such exposés as the Pentagon Papers, the My Lai massacres, the Gulf of Tonkin 'incident,' and the Bay of Pigs invasion, the Government usually suppresses damaging news but highlights favorable news. In this filtering process the secrecy stamp is the officials' tool of suppression and it has been used to withhold infor-

mation which in '99½%' of the cases would present no danger to national security. To refuse to publish 'classified' reports would at times relegate a publisher to distributing only the press releases of Government or remaining silent; if it printed only the press releases or 'leaks' it would become an arm of officialdom, not its critic. Rather, in my view, when a publisher obtains a classified document he should be free to print it without fear of retribution, unless it contains material directly bearing on future, sensitive planning of the Government."

The Government is aghast at a federal judge's even looking at the secret files and views with disdain the prospect of responsible judicial action in the area. It suggests that judges have no business declassifying "secrets," that judges are not familiar with the stuff with which these "Top Secret" or "Secret" documents deal.

That is to misconceive and distort the judicial function under § 552 (a)(3) of the Act. The Court of Appeals never dreamed that the trial judge would declassify documents. His first task would be to determine whether nonsecret material was a mere appendage to a "Secret" or "Top Secret" file. His second task would be to determine whether under normal discovery procedures contained in Fed. Rule Civ. Proc. 26, factual material in these "Secret" or "Top Secret" materials is detached from the "Secret" and would, therefore, be available to litigants confronting the agency in ordinary lawsuits.

Unless the District Court can do those things, the much-advertised Freedom of Information Act is on its way to becoming a shambles.[1] Unless federal courts can be

---

[1] My Brother STEWART, with all deference, helps make a shambles of the Act by reading § 552 (b)(1) as swallowing all the other eight exceptions. While § 552 (b)(1) exempts matters "specifically required by Executive order to be kept secret in the interest of

trusted, the Executive will hold complete sway and by *ipse dixit* make even the time of day "Top Secret." Certainly, the decision today will upset the "workable formula," at the heart of the legislative scheme, "which encompasses, balances, and protects all interests, yet places emphasis on the fullest responsible disclosure." S. Rep. No. 813, p. 3. The Executive Branch now has *carte blanche* to insulate information from public scrutiny whether or not that information bears any discernible relation to the interests sought to be protected by subsection (b)(1) of the Act. We should remember the words of Madison:

"A popular Government, without popular information, or the means of acquiring it, is but a Prologue

---

the national defense or foreign policy," § 4 of Executive Order 11652, as I have noted, contemplates that not all portions of a document classified as "secret" are necessarily "secret," for the order contemplates "excerpting" of some material. Refereeing what may properly be excerpted is part of the judicial task. This is made obvious by § 552 (b)(5), which keeps secret "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." The bureaucrat who uses the "secret" stamp obviously does not have the final say as to what "memorandums or letters" would be available by law under Exemption 5, for § 552 (a)(3) gives the District Court authority, where agency records are alleged to be "improperly withheld," to "determine the matter de novo," the "burden" being on the agency "to sustain its action." Hence, § 552 (b)(5), behind which the executive agency seeks refuge here, establishes a policy which is served by the fact/opinion distinction long established in federal discovery. The question is whether a private party would routinely be entitled to disclosure through discovery of some or all of the material sought to be excerpted. When the Court answers that no such inquiry can be made under § 552 (b)(1), it makes a shambles of the disclosure mechanism which Congress tried to create. To make obvious the interplay of the nine exemptions listed in § 552 (b), as well as § 552 (c), I have attached them as an Appendix to this dissent.

to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives." [2]

I would affirm the judgment below.

## APPENDIX TO OPINION OF DOUGLAS, J., DISSENTING

Sections 552 (b) and (c) of the Freedom of Information Act read as follows:

(b) This section does not apply to matters that are—

(1) specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy;

(2) related solely to the internal personnel rules and practices of an agency;

(3) specifically exempted from disclosure by statute;

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(7) investigatory files compiled for law enforcement purposes except to the extent available by law to a party other than an agency;

(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

---

[2] Letter to W. T. Barry, Aug. 4, 1822, 9 The Writings of James Madison 103 (Hunt ed. 1910).

(9) geological and geophysical information and data, including maps, concerning wells.

(c) This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section. This section is not authority to withhold information from Congress.