NATIONAL COURIER ASSOCIATION
and Purolator Courier Corp.,
Petitioners,

v.

The BOARD OF GOVERNORS OF the
FEDERAL RESERVE SYSTEM,
Respondent,

Cameron Financial Corp., and Courier
Express Corp., Intervenor.

INDEPENDENT BANKERS ASSOCIA-
TION OF AMERICA, INC., a non-
profit corporation, Petitioner,

v.

The BOARD OF GOVERNORS OF the
FEDERAL RESERVE SYSTEM,
Respondent,

Cameron Financial Corp. et
al., Intervenors.

Nos. 73–2235, 73–2240.

United States Court of Appeals,
District of Columbia Circuit.

Aug. 4, 1975.

As Amended Aug. 26, 1975.

Samuel K. Abrams, Washington, D. C., with whom Roger W. Langsdorf, Washington, D. C., was on the brief, for petitioners in No. 73–2235 also argued for petitioner in No. 73–2240.

Harry L. Hobgood, Washington, D. C., for petitioners in No. 73–2235.

Horace R. Hansen and Wayne P. Dordell, St. Paul, Minn., were on the brief for petitioner in No. 73–2240.

Ronald R. Glancz, Atty., Dept. of Justice, with whom Carla A. Hills, Asst. Atty. Gen., Morton Hollander, Atty., Dept. of Justice, and Andrew F. Oehmann, Acting Gen. Counsel, Board of Governors of the Federal Reserve System, were on the brief, for respondent.

Laurence C. Leafer, Alexandria, Va., of the bar of the Supreme Court of North Carolina, pro hac vice by special leave of court, with whom William F. King, Alexandria, Va., was on the brief,

Before McGOWAN, ROBB and WIL-KEY, *Circuit Judges.*

McGOWAN, *Circuit Judge :*

The Bank Holding Company Act of 1956, which generally prohibits bank holding companies from owning shares in companies other than banks, allows such ownership where the activities of the non-bank affiliate have been found by the Federal Reserve Board to be "so closely related to banking or managing or controlling banks as to be a proper incident thereto." 12 U.S.C. § 1843(c)(8) (1970). In the regulation herein challenged on direct review, the Board has enlarged the activities heretofore found by it to be "closely related."[1] The addition consists of certain courier or high speed transportation services for

(i) the internal operations of the holding company and its subsidiaries;

(ii) checks, commercial papers, documents, and written instruments (excluding currency or bearer-type negotiable instruments) as are exchanged among banks and banking institutions;

(iii) audit and accounting media of a banking or financial nature and other business records and documents used in processing such media.

12 C.F.R. § 225.4(a)(11) (1974).

A fourth category of service that may be provided by bank-affiliated couriers is contained in the following "interpretation," also added to Regulation Y by the contested order:

[T]he furnishing of courier services for non-financially-related material upon the specific, unsolicited request of a third party when courier services are not otherwise reasonably available may be regarded as an incidental activity of a bank-related courier.

*Id.* § 225.129.

1. The order in issue amends "Regulation Y," in which there are already listed a number of "closely related" activities. *See* 12 C.F.R. § 225.4 (1974). These include, for example, certain kinds of property leasing, insurance brokerage and underwriting, and financially related data processing. *Id.* §§ 225.4(2)(6), (8)–(10).

For the reasons stated below, the regulation under attack is upheld in part, and in part held invalid.

## I

We note at the outset the limited nature of the question we have been asked to decide. Section 4(c)(8) of the Bank Holding Company Act provides that the general ban on the ownership by a bank holding company of shares in any company other than a bank shall not apply to

shares of any company the activities of which the Board after due notice and opportunity for hearing has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident thereto.

12 U.S.C. § 1843(c)(8) (1970). By an amendment of the same section in 1970 the Board has been further instructed as follows:

In determining whether a particular activity is a proper incident to banking or managing or controlling banks the Board shall consider whether its performance by an affiliate of a holding company can reasonably be expected to produce benefits to the public such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interest, or unsound banking practices.

*Id.*

 The parties are agreed that there are two distinct issues raised by a bank holding company's seeking to hold shares in a company engaged in non-banking activities, and that they correspond to the statutory segments set out above.[2] The first is whether those activities are

2. The statute's legislative history makes clear, if its language does not, that there are two tests to be met in order for an activity to be a "proper incident" to banking, and that these are the "closely related" and "public benefits" tests described in text. *See* H.R.Rep. No. 1747, 91st Cong., 2d Sess. 21–22 (1970), 1970 U.S.Code Cong. & Admin.News 1970, p. 5519

"closely related to banking." This is a question that asks only whether the activities in question are generally of a kind that Congress, having concluded that "banking and commerce should remain separate,"[3] forbade bank holding companies to engage in, without regard to the merits of such engagement in a particular case.

 The second or so-called "public benefits" issue, derived from the 1970 amendments to the Act, is one which normally must be resolved upon specific facts. It poses the question whether the performance of a non-banking activity by a bank holding company affiliate will achieve a favorable balance of the kinds of benefits and adverse effects enumerated in the statute. Naturally the conclusion that the non-banking activity of one bank holding company would be anticompetitive or threaten "unsound banking practices" may not hold for a different bank holding company under different circumstances.

Recognizing this distinction in the nature of the two issues, the Board has reserved the latter for case-by-case resolution at the time of individual bank holding company applications to engage in courier service.[4] The parties are therefore agreed that no Board determination on the "public benefits" of such engagement is now before this court for review.[5] What is before us is the final

(Conference Report). *See also* Independent Bankers Ass'n v. Federal Reserve Board, 170 U.S.App.D.C. ——, 516 F.2d 1206 (No. 73–2025), filed July 31, 1975).

3. S.Rep. No. 1084, 91st Cong., 2d Sess. 12 (1970), U.S.Code Cong. & Admin.News 1970, p. 5531.

4. The order under review does not itself authorize any particular bank holding company to engage in courier activities. Holding companies seeking to engage in the "closely related" activities listed in Regulation Y must individually apply to the Board for consideration of the "public benefits" of each application.

The Board has contemplated two procedures for handling applications to engage in "closely related" activities: (1) notice and opportunity for hearing are automatically required if a holding company seeks permission to acquire a going concern already engaged in "closely related" activities, whereas (2) if a holding company seeks to enter a "closely related" market "de novo," a pro-competitive effect is assumed and entry may proceed without specific approval unless objection is made by a third-party. 12 C.F.R. § 225.4(b) (1974). The Board will not, however, follow this dual procedure with respect to courier service applications. Desiring "to fully consider the public benefits aspects of each [such] application," it has required that all applications to provide courier service, de novo or otherwise, be subject to the stricter procedure for acquisition of going concerns. Statement by Board of Governors of the Federal Reserve System Regarding Bank Holding Companies Performing Armored Car and Courier Services Pursuant to Section 4(c)(8) of the Bank Holding Company Act (hereinafter Statement Accompany Order), J.A. at 822; 12 C.F.R. § 225.4(a)(11) n. 3a (1974).

5. Petitioners informed us at oral argument that before seeing the assurances to this effect in the Government's brief (at 44–45), they were not aware that the public benefits of each application would be open to full future inquiry. This may explain the presence in their own briefs of a number of contentions which seem to us to have dropped out of the case along with the public benefits issue. For example, there has in fact been no "ultimate determination under Section 4(c)(8)" such as is challenged in Part II of the NCA and Purolator brief.

Also seemingly irrelevant are all charges of error in the Board's discussion of public benefits issues. Such charges could of course be relevant if the Board's inclusion of courier activities among those closely related to banking were thought to depend on the validity of its conclusion that "the balance of public interest factors . . . is likely to be favorable in a sufficient number of instances to justify adding certain courier services to the list . . ." J.A. 823. We doubt that this conclusion was a necessary ingredient in the Board's decision, however, and we also see no reason to doubt its validity. There is ample record evidence that in some areas at least the courier service industry is concentrated to the point of monopoly, and that entry by a bank affiliate would improve the competitive climate. *See* note 6 *infra*. Even if the foreseeable instances of such entry being beneficial were very few, we could not say that they were insufficient to justify a rule which merely invited those few applicants to come forward.

Petitioners place special emphasis on their claim that the provision of courier services by bank affiliates will constitute a "branch banking practice." The threat of "unsound banking practices" is, however, one of the "adverse effects" which will be the subject of inquiry in individual application proceedings. Indeed, it

resolution of the former or "closely related" issue with respect to the activities that the Board has added to Regulation Y. The Board's determination that these are not activities necessarily forbidden to bank holding companies takes the form of a rule intended to be binding on all future parties to individual application proceedings. Board Brief at 44.

## II

Courier services were described in the statement accompanying the Board's order as the "transportation of any item with a critical time schedule, provided such items are small in bulk, light in weight, and require only ordinary security measures." J.A. at 813. The items which are carried by courier service in far the greatest volume are financial documents and records—particularly banking instruments—which require speedy transportation from one place of business to another. It thus appears that the nation's banks are by far the largest consumers of courier services, accounting for more than half of that industry's sales. The industry itself is about thirty years old, and has thus far remained largely independent of the banks, though it is dominated by a very few firms.[6]

Of the three categories of courier services that the Board has found to be "closely related" to banking, the first, that of courier services "for the internal operations of the holding company and its subsidiaries," is not in issue. The provision of services by one bank affiliate is expressly allowed by Section 4(c)(1)(C) of the statute. 12 U.S.C. § 1843(c)(1)(C) (1970).

The second category is that of courier services "for checks, commercial papers, documents, and written instruments (excluding currency or bearer-type instruments) as are exchanged among banks and banking institutions." What is meant are the so-called "cash letters" in which one bank transmits all the checks, drafts, and money orders that must be cleared or otherwise processed at another bank. As the Hearing Examiner explained:

> The some 13,000 commercial banks of the country, with their 30-odd thousand banking offices, have check-drawing customers who generate perhaps 25 billion checks a year, drawn on those banking offices. These checks are sent to payees by the drawers, and the payees either cash them at a bank, the corner druggist or some similar establishment, or "deposit" them for collection with their own banks. More often than not (say, 80 percent of the time), a given check thus deposited will be drawn on another bank.
>
> As is well known, the checks drawn on other banks are presented either directly to that bank, or if presented indirectly, through one or more intermediate collecting banks, which may include Federal Reserve banks. They are sent in what is called a "cash letter," which may be an adding machine tape or its equivalent, wrapped around the items, all of which are n an envelope or other container, suitably addressed. When indirect presentment occurs, the collecting banks in the

---

is difficult to see how the matter can be explored *except* in the concrete setting of a particular application, for branch banking by a national bank is only "unsound" if it crosses the borders of the bank's home state or otherwise violates that state's laws. 12 U.S.C. § 36(c) (1970). The extent of proposed courier services will of course vary from application to application, as will the relevant state law.

We also omit extended discussion of petitioners' claim that insufficient reasons were given in support of the Board's order. In fact, the only inadequacy charged is in the Board's justification of its public benefits conclusions.

As noted above, these conclusions are only tangentially relevant to this appeal. In any case, the Board seems to us to have adequately justified them by adopting the more extensive reasons of the Hearing Examiner. *See* Statement Accompanying Order, J.A. 817–820.

**6.** The record contains estimates that the total annual revenues of the courier industry are approximately $76 million, the share of the largest five firms $65 million, and that of the single largest firm (Purolator, Inc.) $46 million. J.A. 22, 365.

chain are usually concentration points for the processing of huge volumes of checks.

J.A. 700–701.

The third category of "closely related" courier services are those "for audit and accounting media of a banking or financial nature and other business records and documents used in processing such media." The term "media" appears simply to refer to the physical form (paper documents, magnetic tapes, etc.) in which the financial data to be processed are conveyed. To cite a concrete example, one used by the Hearing Examiner, a bank which accepts demand deposits may find it efficient, particularly if it is a small bank, to employ a data processor to keep and update the records of those accounts—in effect to perform a bookkeeping function for it. As was testified at the hearings:

> In such a service, the inbound movement from the customer bank to the data center requires a pickup after the close of business at the customer's location of the data reflecting the day's transactions, and delivery to the computer center in sufficient time to permit overnight processing of the data and a return of the reports updating the bank's accounts prior to the opening of business the next morning.

J.A. 703.

The "data center" need not, of course, be a bank. In this respect the Board's order must be read in connection with an earlier section of Regulation Y permitting bank affiliates to provide financially related data processing services such as " . . . payroll, accounts receivable and payable, or billing services." 12 C.F.R. § 225.4(a)(8) (1974). In effect subsection (iii) of the present rule authorizes bank-affiliated couriers to furnish transportation services which complement the activities of fellow affiliates engaged in data processing, just as subsection (ii) of the rule authorizes them to provide transportation services which complement the activities of fellow affiliates engaged in banking.

The fourth category of authorized courier services, that contained in the Board's separate "interpretation," is largely self-explanatory. Bank-affiliated couriers may carry non-financially related material if requests for such service are unsolicited and it is not otherwise reasonably available. Any doubt as to the lack of limitation on the kind of material that may be carried under this heading was erased by the press release accompanying the Board's order, which gave as examples "human blood, exposed and processed film, repair parts and cut flowers." J.A. at 800.

### III

No challenge is made to the procedure by which the amendments to Regulation Y were adopted,[7] but merely to their substance. In this respect our task is to set aside the Board's findings of fact if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"[8] while deciding "all rele-

---

**7.** No formal rule making proceedings were held, it being the Board's view, uncontested in this appeal, that amendments to Regulation Y are not "required by statute to be made on the record after opportunity for an agency hearing," and thus not subject to the requirements of Sections 7 and 8 of the Administrative Procedure Act. *See* 5 U.S.C. §§ 553, 556–57 (1970). Following the notice of proposed rule making, requests were submitted to the Board for formal proceedings, and the Board responded by ordering a "more formal proceeding than originally planned." Although APA Sections 7 and 8 were not complied with, a hearing officer was appointed and a two-day hearing held. Ten witnesses testified. On the basis of this live testimony and numerous written submissions, the hearing officer issued a recommended decision, on which the Board substantially relied. *See* J.A. 674–75, 810.

**8.** In keeping with its view that its findings in this case were not "required by statute to be made on the record after opportunity for an agency hearing," *see* note 7 *supra,* the Board maintains that the proper standard of review of those findings is the "arbitrary and capricious" rather than the "substantial evidence" standard. *See* Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413–15, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); 5 U.S.C. § 706 (1970). Petitioners do not appear to contest this conclusion, urging instead that the question decided by the Board was one of law.

vant questions of law" ourselves. 5 U.S.C. § 706 (1970).

Without slighting the difficulties of separating questions of law and fact,[9] but also without rehearsing them at any length, we address what seems to us the single "question of law" in the case, and that is the proper definition of the statutory phrase "closely related." Is it an intentionally vague phrase by which Congress very largely left it up to the Board to decide what kinds and degrees of relationships are sufficiently close? Or is there some more specific connection that the Board must find exists between banking and the assertedly related activity?

Unfortunately, no clear answers emerge from the legislative history of the statute. Its original passage in 1956 was accompanied by numerous expressions of the view that, in order to guard against conflicts of interest, bank holding companies should be confined to banking and to activities "closely related to the business of banking," but the quoted phrase was never elucidated.[10] The Board interpreted this language restrictively, judging that it prohibited affiliation with any company whose activities were not directly related to the banking operations that the particular holding company was already engaged in.[11] It was for this reason that the Board in 1969 proposed amendments to the Act which would give the bank holding companies greater flexibility.

A comparison of the wording of Section 4(c)(8) before and after it was amended might suggest that the Board had limited success. What had read:

> . . . activities . . . which the Board . . . has determined to be so closely related to the business of banking or of managing or controlling banks as to be a proper incident thereto . . . ."

70 Stat. 135 (1956), was amended to read:

> . . . activities . . . which the Board . . . has determined . . . to be so closely related to banking or managing or controlling banks as to be a proper incident thereto.

12 U.S.C. § 1843(c)(8) (1970).

The history of these seemingly slight changes tells a different story, however. Though the precise amount of the intended increase in the latitude to be given the bank holding companies is something of a puzzle, it is plain that Congress intended to expand that latitude in substantial degree. The House and Senate each passed versions of the amendments which replaced the term "closely related" with the term "functionally related," and which were expressly intended, at least by the respective reporting committees, to relax the earlier restrictions.[12] The term "functionally related" disappeared in conference (just how much of a retreat this represented is unclear[13]), but the relaxation of restrictions did not. It is embodied in the substitution of the word "banking" for the phrase "the business of banking," the latter having been the source of the Board's earlier restrictive approach.[14]

---

9. *See generally*, 4 *K. C. Davis, Administrative Law Treatise*, 189–270 (1958).

10. *See* S.Rep.No.1095, 84th Cong., 2d Sess. (1956); H.R.Rep.No.609, 84th Cong., 2d Sess. 1956).

11. *See Hearings on H.R. 6778 Before the House Committee on Banking and Currency,* 91st Cong., 1st Sess. 198–199 (1969) (Statement of William McChesnev Martin. Jr.)

12. *See* H.R.Rep.No.387, 91st Cong., 1st Sess. (1969); S.Rep.No.1084, 91st Cong., 2d Sess. 12–15 (1970).

13. The conference report was issued with a Statement of the Managers on the Part of the House, in which it was said that the "functionally related" language had been abandoned because it too greatly liberalized the restrictions. H.R.Rep.No.1747, 91st Cong. 2d Sess. 19–20 (1970). Though the statement was signed by a majority of the conference committee's House members, however, it may not have represented the views of a majority of both the House and Senate conferees, some of whom considered the two phrases so similar in meaning that the change was unimportant. *See, e. g.,* 116 Cong.Rec. 42432–36 (1970) (Remarks of Senator Bennett).

14. The amendment in its ultimate form was apparently satisfactory to the principal propo-

A substantial relaxation of the required closeness of the relation of bank affiliate activities to banking is of course consistent with Congress's simultaneous addition in 1970 of the public benefits test. The latter requires the Board to judge whether particular activities are "properly incident to banking" by specific reference to most if not all of the evils which the Act as a whole aims at preventing. *See* 12 U.S.C. § 1843(c)(8) *supra*. Congress has thus introduced a new and more refined test for the presence of those evils. The "closely related" test no longer bears the full load, and may now be thought of as setting off as forbidden to banks those activities which are so clearly of a purely commercial nature that the predominantly adverse effects of a bank's engaging in them may be presumed.[15]

■ Against this background, and reminding ourselves that the matter is one expressly committed by the statute to the Board, we think we owe considerable deference to the Board's judgment that a particular activity is "closely related to banking." Rather than define that term with any precision, therefore, we simply require that the Board go about making its "closely related" decision in a reasoned fashion consistent with the legislative intent.

■ The Board must, we think, articulate the ways in which banking activities and the proposed activities are assertedly connected, and must determine, not arbitrarily or capriciously, that the connections are close. As to what kinds of connections may qualify, at least the following seem to us within the statutory intent:

1. Banks generally have in fact provided the proposed services.

2. Banks generally provide services that are operationally or functionally so similar to the proposed services as to equip them particularly well to provide the proposed service.

3. Banks generally provide services that are so integrally related to the proposed services as to require their provision in a specialized form.

We turn, then, to the question of whether the Board has rationally found such connections in this case.

### A. *Banking Material.*

■ The Board appears to have found all three of the foregoing kinds of connections between banking and courier service for banking material. It made clear, for example, that it did not regard courier service as the exclusive historical province of specialized carriers. It noted that "three bank holding companies, all of which became subject to the Bank Holding Company Act as a result of the 1970 Amendments, are engaged in providing 'for hire' courier service."[16]

---

nent of expanded latitude for the bank holding companies, namely, the Board itself. Chairman Arthur Burns stated in a letter to the conference committee:

> If the conferees prefer to keep "closely related" in the language of the statute, our objective would be served by changing the words "the business of banking or of managing or controlling banks" to read "banking or managing or controlling banks". We have in mind indicating that a nonbank subsidiary's activities should be related to banking (or managing or controlling banks) generally, rather than to the specific business carried on by the subsidiary banks of the particular holding company involved.

Reproduced in H.R.Rep.No.1747, 91st Cong., 2d Sess. at 16 (1970), U.S.Code Cong. & Admin.News 1970, p. 5567.

**15.** We have recently demonstrated our intention to require that the "public benefits" test be applied by the Board with some care. In Independent Bankers Ass'n v. Federal Reserve Board, 170 U.S.App.D.C. ——, 516 F.2d 1206 (No. 73–2025, filed July 31, 1975), we held that before approving the application of a bank affiliate to engage in a closely related activity, the Board was required to hold an adjudicatory hearing on the "public benefits" question at the instance of any protestant who raised a material factual dispute.

**16.** Statement Accompanying Order, J.A. at 814.

We note that banks subject to the National Pank Act are themselves empowered to provide, incidentally to banking, a "messenger service by means of an armored car or otherwise," 12 C.F.R. § 7. 7490 (1970). *See* note 21 *infra* and accompanying text.

As to the second kind of connection, the Board pointed out that the internal operation of a bank often involves it in transportation activities of the kind involved in courier service. According to the Board, "a number of banks, particularly those which operate a significant number of branches, engage in the transportation of such items as checks, internal memoranda and data processing material between branches . . ." J.A. at 814. The business of banking, after all, does not consist solely of abstract interest computations and lending and borrowing decisions. It is in an equally important sense the management of the torrential stream of documents and records that are the medium of financial transactions. And if it would be impossible to say that the management of that stream *within* a bank is not "banking," it would also be hard to say that the management of that stream *between* banks is not "closely related" to banking.

The third kind of connection—the dependence of banks on a specialized form of the proposed services—has been the most emphasized in this case. The Board concluded that "courier services for cash letters play a vital role in the check clearing process," and that "the transportation of a cash letter has been so integrated into the process by which checks are collected as to be part of the present payments mechanism." J.A. at 813–815. Petitioners do not really dispute the point, but urge that, if the necessity of a service to banking activities may justify the establishment of a bank affiliate to provide the service itself, then the banks may expand into any number of industries whose goods and services they consume. Telephone service is given as an example. Apart from noting that this kind of connection to banking is not the only one present in the case, we can only respond by emphasizing that the service must be required by the bank in a specialized form, as is not true of telephone service or of many others that banks employ.

The Board has thus articulated several ways in which banking and courier services for banking materials may properly be considered related. Record evidence in support of each is ample, and we cannot say that in finding the relation a "close" one the Board was arbitrary or capricious.

### B. Financially Related Data Processing Materials.

The Board's findings with respect to financially related data processing materials, though less explicit than its findings with respect to "cash letters," were to the same effect. It did not specify whether the banks which it found were already engaged in "for hire" courier services had been transporting data processing as well as other materials, but the record suggests that such was the case.[17] The Board specifically named data processing materials as among the items that banks with numerous branches often transport for their own purposes between branches.[18] Once again, the greatest stress was put on the need for a specialized form of transportation service. The Board noted that the Hearing Examiner had found that "courier service is essential to the performance of data processing activities." The Hearing Examiner had in turn cited, in support of his conclusion that the transportation of audit media was "time critical," the following testimony of a data processing executive:

> In the data processing part of the business, we sell accuracy and timeliness. The timeliness of what we sell is a function in competitiveness. We can print 1000 lines a minute, and if we can't get it to the client it is meaningless.

Hearing Officer's Recommended Decision, J.A. at 704. In short, the Board treated the transportation of data proc-

---

17. *See* Memorandum from Legal Division to the Federal Reserve Board, October 5, 1973, J.A. at 794.

18. Statement Accompanying Order, J.A. at 814.

essing material as bearing the same relation to data processing itself as the transportation of cash letters bears to banking, and we cannot say that it was arbitrary or capricious in doing so.

The difficult question, of course, is whether the similarity of these two relations was enough. There is no question that courier service for data processing material has been found "closely related to banking" not because of its connection to banking *per se* but because of its relation to financial data processing, an activity banks are permitted to engage in. We are not so much bothered by the illogic of the reasoning (which could be overcome by simply asserting that the data processing industry as a whole is "closely related to banking") as we are by the danger, pressed on us by petitioners, that if the Board is permitted to string together a chain of close relations, the limitation means nothing.

Certainly the Board will not be permitted to tack one close relation on to another indefinitely, but we cannot forbid it in this case. The relations are of distinctly different kinds. That of financial data processing to banking may be thought of as horizontal, in the sense that these are parallel and kindred financial services. That of banking to the transportation of cash letters, and of financial data processing to the transportation of audit and accounting media, may be thought of as vertical, in the sense that transportation is a non-financial service necessary to the provision of financial services. Rather than threaten infinite repetition, the Board's reasoning seems rather to complete the missing fourth side of a square. More persuasive than its symmetry, however, are the practical realities it reflects. The record suggests that in many cases check processing and financially related data processing are carried on at the same locations and by the use of the same equipment.[19] It would seem anomalous to require that similar material, quite possibly generated by a single customer and

destined for a single bank computer, be transported by two separate couriers.

We have not overlooked the fact that no restrictions are placed by the challenged regulation upon whom a bank-affiliated courier may serve. The carriage of banking materials authorized in the second part of the Board's order will presumably be between banks, but neither need be an affiliate of the bank-affiliated courier. The carriage of data processing materials under the third part of the Board's order may be between two places of business neither of which is a bank, a bank affiliate, or a customer of either. A bank-affiliated courier may thus carry the financially related records of a firm with which it has no dealings (let us say a department store that does its banking elsewhere,) to the independent data processor of that firm's choice. It is at this point that the Board has put its discretion to determine the closeness of relations to banking under the greatest strain.

We do not think it has exceeded that discretion, however. Authorization to provide courier services to banks and bank affiliates must carry with it the authorization to provide the same services generally. The reason is that otherwise the bank-affiliated courier services, which may be of superior quality, would be "tied" by law to the other services which banks and their affiliates provide. The anti-competitive effects of such a tie in respect of banking services would contravene the Act's most basic purposes. Recognizing this, the Board has in fact not only authorized but intends to *require* bank affiliated couriers to provide their services generally and without discrimination. *See* 12 C.F.R. § 225.129 (1974).

C. *General Courier Services Where Unsolicited and Not Otherwise Available.*

The Board has apparently not taken the manifestly untenable position that the transportation of non-financially re-

---

**19.** *See, e. g.,* Statement of William G. Sizemore, Senior Vice President, Wachovia Corporation, J.A. at 295–308.

lated material becomes "closely related" to banking simply because such service is provided without solicitation and is not otherwise available. Its position appears instead to be that in such circumstances concededly *non*-closely related services may be provided because they are purely "incidental." It suggests, in other words, that in requiring that the "activities" of bank affiliates be closely related to banking, Congress meant only their *ordinary* or *principal* activities, and left them free to engage in other activities certified by the Board to be "incidental."

The notion that bank affiliates may be permitted to engage not only in activities that are "closely related to banking," but also in "incidental" activities was not first introduced by the Board in the context of courier services. It apparently takes the same view with respect to all categories of "closely related" activities, having announced in the first sentence of its Regulation Y:

> . . . [A]ny bank holding company may engage, or retain or acquire an interest in a company that engages solely in one or more of the [closely related] activities specified below, *including such incidental activities as are necessary to carry on the activities so specified.*

12 C.F.R. § 225.4(a) (1974) (emphasis supplied). The Board has in fact gone on to specify the activities that may be engaged in as "incidental" to one other "closely related" activity, that of financially related data processing.[20] Nor is the permissibility of activities "incidental" to those that are expressly authorized a notion that originated with the Board. That section of the National Bank Act which circumscribes the activities of nationally chartered banks entitles them "[t]o exercise . . . all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 (1970).[21]

The idea is thus fairly well established that Congress intended some reasonable latitude in the limitations it placed upon the activities of banks and their affiliates. In enumerating the activities that could be carried on, it certainly could not have meant to forbid engagement in such other "incidental" activities as were reasonably necessary to carrying out those that were enumerated.

The justification for the "incidental" courier services at issue here is, however, quite different. It is not, as far as we can tell, that the carriage of non-financially related material is in any way necessary to the successful operation of the courier service affiliates. Rather, it is that the provision of such service would serve "the convenience of the public."[22] We have in effect been asked to approve a doctrine of "incidental" activities under which the Board may permit bank affiliates to engage in such activities because such engagement would be a generally beneficial thing. The Board has made quite an appealing case in this respect. If requests for non-financially related courier services must be unsolicited, it may seem unlikely that a bank's courier affiliate would ever get very deeply involved in providing them. If such services must be otherwise unavailable, then those who employ it would appear to gain, while no competitor of the bank loses.[23] It might thus be ar-

---

**20.** See 12 C.F.R. § 225.123(g) (1974).

**21.** Examples of "incidental" activities that national banks have been permitted to engage in are the maintenance of postal substations on bank premises, the provision of messenger services, and the acquiring of equity interests in community development projects, though such an interest would "clearly not [be] a bankable asset by ordinary standards." 12 C.F.R. §§ 7.7480, 7.7482, 7.7490 (1974).

**22.** Hearing Officer's Recommended Decision, J.A. at 774.

**23.** In discussing at oral argument the kinds of material transportable under this portion of the Board's order, the parties were careful in their choice of which of the Board's examples to stress. Opponents of the order dwelt on the cut flowers; its defenders, on the human blood, always pictured as being rushed to donees in extremis. In answer to the latter suggestion, we suppose that, if and when there is a true emergency requiring a bank affiliate to carry human blood, no one will object if it does so. If there is no true emergency, any real need will presumably be met in other ways.

gued that the provision of general courier services under the conditions the Board has imposed offends none of the policies against economic concentration and conflicts of interest which underlie the statutory separation of commerce and banking.

But Congress did not instruct the Board to allow or disallow bank involvement in non-financial activities as may be required by the policies which counsel a separation of commerce and banking. Having heeded that counsel itself, it decreed the separation, and instructed the Board to enforce it. Its decision hardly seems an unreasonable one, even in the context of this case, for it is not at all clear that the Board's non-solicitation and non-availability conditions would in fact prevent bank-affiliated couriers from becoming substantially involved in general courier service. The problem, of course, is the inexactitude of such terms as "unsolicited" and "not otherwise reasonably available."

■ The result is that while there may be some warrant in the statute for the Board's permitting as "incidental" those activities that are necessary to the bank affiliate's closely related activities, we can find no such warrant for its determination that non-financially related courier services are "incidental" and therefore permissible if unsolicited and otherwise unavailable. The Board's order, which we have sustained in other respects, we decline to do so in this one.

### IV

The record in this case includes two intra-agency memoranda addressed to the Board from its Legal Division and from its Research and Statistics Division, parts of which the Board deleted on the ground that they contained "internal recommendations, staff analysis and work product and legal opinions." Petitioners have moved that these be included in the public record. The deleted material was ordered to be lodged with the court for *in camera* inspection, but further action was deferred until considera-

tion of the case on its merits by this division.

Authority is sparse on the question of what internal agency memoranda are properly a part of the record in direct review proceedings. In *Norris & Hirshberg v. SEC,* 82 U.S.App.D.C. 32, 163 F.2d 689 (1947), we held that a summary of record evidence prepared for the Commission by its staff need not be included in the record. The case left much in doubt, however, stating that includibility "depends upon the nature of the summary and the use to which it was put by the Commission." *Id.* at 693.

■ The Government takes the position that internal staff memoranda are never part of the record, since such documents are not within the statutory definition of the record as "the order sought to be reviewed or enforced, the findings or report upon which it is based, and the pleadings, evidence, and proceedings before the agency." 28 U.S.C. § 2112(b) (1970). *See also* Fed.R.App.P. 16. We think a fuller analysis is called for. Private parties and reviewing courts alike have a strong interest in fully knowing the basis and circumstances of an agency's decision. The process by which the decision has been reached is often mysterious enough without the agency's maintaining unnecessary secrecy. To be sure, the agency may have a strong interest of its own in keeping internal documents from public view, but it will normally be far easier for the agency to e tablish its interest in suppressing such documents than for the private litigants to establish their interest in exposing them to judicial scrutiny. The proper approach, therefore, would appear to be to consider any document that might have influenced the agency's decision to be "evidence" within the statutory definition, but subject to any privilege that the agency properly claims as protecting its interest in non-disclosure.

■ One such privilege is, of course, that which protects internal memoranda embodying the deliberative processes of the agency and its staff. The privilege is well established in several lines of

cases which, although not specifically concerned with the proper content of agency records, are closely analogous.

 Unless he has left no other record of the reasons for his decision, the mental processes of an administrator may not be probed. *Compare United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941), *with Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The analysis and recommendations of agency staff members need not be divulged to the parties in proceedings before the agency itself. *See, e. g., T. S. C. Motor Freight Lines, Inc. v. United States,* 186 F.Supp. 777 (S.D.Tex.1960), *aff'd sub nom. Herrin Transportation Co. v. United States,* 366 U.S. 419, 81 S.Ct. 1356, 6 L.Ed.2d 387 (1961): *K. C. Davis, Administrative Law Treatise* § 11.09 (1958, Supp. 1970). Most directly in point is the privilege against discovery of deliberative intra-agency memoranda in litigation involving an agency. *See, e. g., Freeman v. Seligson,* 132 U.S.App.D.C. 56, 405 F.2d 1326, 1338–39 (1968). The same privilege exists against disclosure under the Freedom of Information Act, having been retained by Congress in the form of that Act's Exemption 5 for non-discoverable intra-agency memoranda. 5 U.S.C. § 552(b)(5) (1970); *EPA v. Mink,* 410 U.S. 73, 86, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973).

Two exceptions that have been made to the non-disclosability under FOIA of intra-agency deliberative memoranda are for (1) those parts of such memoranda that are purely factual in nature, *see e. g., EPA v. Mink, supra* at 89, 93 S.Ct. 827; *Soucie v. David,* 145 U.S.App.D.C. 144, 448 F.2d 1067, 1077–78 (1971), and (2) memoranda adopted by the agency as the basis of its decision. *See, e. g., American Mail Line, Ltd. v. Gulick,* 133 U.S.App.D.C. 382, 411 F.2d 696, 699–703 (1969). Without deciding that they are exactly contiguous, we consider that the same exceptions exist to the privilege for deliberative intra-agency memoranda as against inclusion in the public record on appeal. Purely factual material is, after all, not deliberative, and the agency has no good reason to withhold it. Memoranda on which the agency decision is based are specifically made a part of the appellate record by the statute. *See* 28 U.S.C. § 2112(b) (1970), *supra.*

 Petitioners have in fact sought inclusion of the deleted segments of the memoranda on both grounds. They claim that by including the undeleted parts of the memoranda in question in the record, the Board indicated that they were the basis of its decision and thereby destroyed any privilege. We draw no such inference. As noted in the earlier parts of this opinion, the basis of the Board's decision was adequately given in its order and accompanying statement. This being so, we can see no reason to believe that in including in the record those segments of the memoranda that it did, the Board had anything other than the entirely laudable objective of notifying the parties that they existed and of disclosing what it considered non-privileged sections.

 With respect to the factual content of the deleted material, petitioners do not deny that summaries of record evidence may be deliberative and therefore privileged. *See, e. g., Washington Research Project v. HEW,* 164 U.S.App. D.C. 169, 504 F.2d 238 (1974); *Montrose Chemical Corp. v. Train,* 160 U.S.App. D.C. 270, 491 F.2d 63 (1974); *Norris v. Hirshberg, supra.* They claim, however, that the deleted material contains facts not otherwise in the record. Such facts would certainly constitute "evidence" which should be included in the record, at least in paraphrased form, if they cannot otherwise be disentangled from analysis and opinion.

 In fact, however, our *in camera* review of the deleted material reveals that it consists almost exclusively of record summaries and expert or legal opinions. We can find only three instances in which the memoranda introduced factual information not otherwise in the record. All of these occur in the

memorandum of the Board's Research and Statistics Division.

The first is a reference to a report in the *Chicago Tribune* concerning the recent acquisition by the American Courier Corporation (Purolator's subsidiary) of a number of competing armored car companies. The second and third are references to orders of the Interstate Commerce Commission in which that agency passed on the legality of the courier operations of two bank holding companies. In one of these Cameron Financial Corporation was reported by the Commission, and in turn by the Research and Statistics Division, to have stated that it established a courier subsidiary because it believed that courier service could be provided at half the price that was being paid to the independent firm.

In the second order the Wachovia Bank was reported as stating, in defense of its own courier operations, that they were not carried on for profit. The former order is also cited in passing by the Research and Statistics Division as containing evidence that the service provided by independent couriers was not always satisfactory.

It may be that the factual information thus presented in the deleted parts of this memorandum should have been made a part of the record. The omission was clearly not significant, however, since the information is only remotely relevant to this appeal. It bears in each case on the competitive climate in the courier industry and therefore on the "public benefits" issue which the agency has not yet decided. *See* note 5 *supra.*

The petition for review is denied in all respects with the exception that so much of the so-called "interpretation" added to Regulation Y as relates to the furnishing of courier services for non-financially-related material, treated within ¶ III. C. of this opinion is set aside.

*It is so ordered.*