Ernest L. BELL, III

v.

UNITED STATES of America, DEPARTMENT OF DEFENSE et al.

Civ. A. No. 75–331.

United States District Court, D. New Hampshire.

May 7, 1976.

Arnold R. Falk, Bell & Falk, Keene, N. H., for plaintiff.

William J. Deachman, U. S. Atty., for the District of New Hampshire, Concord, N. H., Irving Jaffe, Dept. of Justice, Information and Privacy Unit, Civ. Div., Washington, D. C., for defendants.

## MEMORANDUM OPINION

BOWNES, District Judge.

Plaintiff brings suit under the Freedom of Information Act, as amended, 5 U.S.C. § 552, *et seq.* [hereinafter cited as FOIA] seeking a court order requiring the defendants to release to him certain classified intelligence data gathered by the Military Intelligence Services during the European and Pacific campaigns of World War II. The named defendants are: United States Department of Defense, National Security Agency, General Services Administration, and the Archivist of the United States. Jurisdiction is proper under 5 U.S.C. § 552(a)(4)(B).

The documents being sought were gathered and collated by the Allied Intelligence Services during World War II. According to plaintiff, during World War II, the German Military Reports Branch and its predecessor, the Order of Battle Branch, received daily "cables of ULTRA traffic" from American officers based in Bletchley, England. (Pl's. Ex. A.) The designations and information contained in these cables formed the basis for the daily "Magic summary" which was then distributed in limited numbers to select personnel. The pleadings do not disclose the substantive nature of these cables. After the end of the European campaign, certain members of the

German Military Branch were transferred to Bletchley, England, where an extensive study of the ULTRA program was undertaken.

The information and documents which plaintiff seeks are a byproduct of this study and are specifically outlined in a letter sent to Norman Boardman, Information Officer for the National Security Agency, on January 19, 1976. The letter sought the following documents:

"1. 'Use of CX/MSS ULTRA by the U. S. War Department (1943–1945)'

"2. 'Synthesis of Experience in the Use of ULTRA Intelligence by U. S. Army Field Commands in the European Theatre of Operations.'

"3. The original reports submitted by the ULTRA field officers at the conclusion of the European war in 1945 which served as the basis of the report requested in # 2.

"4. The joint Anglo-American in-depth historical study of World War II and particularly the European theatre originally researched and written in Bletchley, England, in 1945 and probably not finished until 1946. This is a lengthy, scholarly work going well beyond the publications contained in # 1 and # 2. This work primarily drew on material gathered from the ULTRA source.

"5. All material for the years 1943–1945 (and before if such material is available) from the Order of Battle Branch of the Intelligence Group, the Military Branch of the Research Unit and the Reports Unit and its branches [Japanese Military Reports Branch, German Military Reports Branch, Political and Economic Reports Branch and the Publications Branch] of the Military Intelligence Service and/or Military Intelligence Division of the War Department, together with certain underlying raw material that went into the production of the daily top secret reports by these units under the name of Magic Summaries.

"6. If not included in the above, all daily cables that were received in the German Military Reports Branch and its predecessor, the Order of Battle Branch, during the years 1942, 1943, 1944 and 1945, on a daily basis from American officers based at Government Code and Cypher School, Bletchley, England. This was known as the ULTRA traffice [sic] and was transmitted to this country by secure British communications and then delivered to the units of intelligence establishment mentioned above. These cables carried various designations such as TAY, LOR, BEV and KIT together with a series of three numbers. This particular material formed the basis for the daily Magic Summaries requested in # 5 above.

"7. If not included in # 6, all cables from the same source that were used by any of the units mentioned in # % [sic]. In other words, I wish access to all of this cable traffic whether delivered to German Military Reports Branch or to others." (Pl's. Ex. G attached to Motion to Amend Complaint.)

Most of the material being sought is more than thirty years old. *See* Executive Order No. 11652, 3 C.F.R. § 5(E) at 345 (1974).

## PROCEDURAL HISTORY

Plaintiff's pursuit of these documents began on August 11, 1975, when he sent a letter to the National Security Agency [hereinafter referred to as NSA], Fort George G. Meade, Maryland, seeking information as to the whereabouts of the "ULTRA" and "Magic" documents. (Pl's. Ex. A.) A similar letter was sent to the Archivist of the United States, James B. Rhoads. (Pl's. Ex. B.) A triangular path of communication was then initiated between plaintiff, Boardman of the NSA, and Rhoads. (*See* Pl's. Exs. C, D, E, & F.)

Plaintiff did not receive the requested material and on November 6, 1975, he filed suit in this court. A hearing scheduled for January 23, 1976, was canceled on January 22 after plaintiff realized that his complaint was premature in that (1) he had never specifically informed the defendants he was seeking the material under the FOIA, 32 C.F.R. § 2220.3(a) (1974), and (2) he had failed to exhaust his administrative remedies. *Tuchinsky v. Selective Service System,* 418 F.2d 155, 158 (7th Cir. 1969); *but*

see *Diapulse Corp. of Am. v. Food & D. Admin. of Dept. of H.E.W.,* 500 F.2d 75, 77 (2d Cir. 1974). In order to rectify these deficiencies, plaintiff wrote to Boardman on January 19, 1976, and requested the documents under the FOIA. (*See* Pl's. Ex. G attached to Motion to Amend Complaint.)

By letter dated February 20, 1976, Boardman responded to plaintiff's request for documents contained in the January 19 letter. Boardman ruled that Items 1 and 2 were classified in their entirety and, therefore, exempt from access or release pursuant to 5 U.S.C. § 552(b)(1) and (3); Item 3 could not be located; Item 4 was not "in the permanent possession of the United States" and, therefore, was not a record subject to the FOIA but, even if it was "determined to constitute such a record, it would be exempt under" 5 U.S.C. § 552(b)(1) and (3); Item 5 contained 290 documents, portions of which could be released; and Items 6 and 7 were properly classified and exempt from access or release pursuant to 5 U.S.C. § 552(b)(1) and (3). In accord with a letter from the Secretary of Defense to the Archivist of the United States, the materials contained in Items 6 and 7 were undergoing a review for reclassification and plaintiff would be notified as to the progress of the reclassification procedure. (Pl's. Ex. H attached to Motion to Amend Complaint.)

Plaintiff appealed the denial on February 24, 1976. (Pl's. Ex. J attached to Motion to Amend Complaint.)

On March 25, 1976, John R. Harney, Freedom of Information Appeal Authority, affirmed in part and reversed in part Boardman's ruling on requested Items 1 and 2. Based on his review of the documents, Harney determined that thirty-two pages of Item 1 and twenty-four pages of Item 2 were not properly classified and could be released. Parts of the released text, however, were deleted. Harney affirmed Boardman's determination that requested Items 3, 4, 5, 6, and 7 were either nonexistent or properly classified and, therefore, exempt from release. 5 U.S.C.

§ 552(b)(1) and (3). (Pl's. Ex. K. attached to Motion to Amend Complaint.)

With procedural formalities satisfied, a hearing was held on March 30, 1976. At that hearing, plaintiff brought three motions which are the subject of this opinion: Motion to Amend Complaint, Motion for *In Camera* Examination under 5 U.S.C. § 552(a)(4)(B), and Motion for Discovery. Defendants filed written objections to these motions on April 7, 1976, and informed the court that a supporting memorandum of law would be filed. As of May 4, 1976, no memorandum has been filed and, considering the important role that Congress designed for the FOIA, I shall not delay the issuance of this opinion merely to accommodate the defendants. *See* 5 U.S.C. § 552(a)(4)(D).

## THE LAW

*Motion to Amend Complaint*

Fed.R.Civ.P. 15(a) allows a party to "amend his pleading once as a matter of course at any time before a responsive pleading is served . . . . Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."

In response to plaintiff's complaint, defendants filed a motion to dismiss on the grounds that this court lacks jurisdiction over the subject matter and/or the complaint fails to state a claim upon which relief can be granted.

The filing of a motion to dismiss is not deemed to be a responsive pleading within the meaning of Rule 15 and plaintiff may amend his complaint without leave of court. *Walgren v. Howes,* 482 F.2d 95, 96 n. 1 (1st Cir. 1973); 3 Moore's Federal Practice ¶ 15.07[2] at 851–52 & n. 6. Even if plaintiff is not entitled to amend his complaint as a matter of right, the language of Rule 15 and numerous judicial pronouncements provide that "leave shall be freely given when justice so requires." *See generally* 6 Wright & Miller, Federal Practice and Procedure: Civil § 1484 at 417 & n. 9. The decision whether or not to grant a

motion to amend is committed to the trial court's discretion and, based upon the facts of this case, plaintiff's motion to amend under Fed.R.Civ.P. 15(a) is granted.

 I should add that, from a technical standpoint, plaintiff's motion to amend is more in the nature of a supplemental pleading. Fed.R.Civ.P. 15(d). Even when the original complaint fails to state a claim upon which relief can be granted, 15(d) allows a court to permit the supplementary pleading when new events have made clear plaintiff's right to relief. Rule 15(d) should be broadly interpreted and there is no indication that granting plaintiff's motion "to amend" will prejudice defendants or introduce into the suit a new and distinct cause of action. I, therefore, would allow plaintiff, under Fed.R.Civ.P. 15(d), to amend his complaint by filing a supplemental pleading "setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented."

## Motion for In Camera Inspection

In *EPA v. Mink*, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), the Supreme Court considered the question whether a federal court could conduct an *in camera* inspection of documents which the Executive claimed were exempt under 5 U.S.C. § 552(b)(1); that section exempted from the FOIA documents and materials "specifically required by Executive Order to be kept secret in the interest of the national defense or foreign policy." In *Mink,* the documents sought had been classified pursuant to Executive Order No. 10501.[1] After reviewing the legislative goals of the FOIA, the Court went on to hold that Exemption 1 does not permit or authorize *in camera* inspection of documents which are withheld under that section. The Supreme Court reasoned that so long as the documents were properly classified, no court could go behind the classification and "separate the secret from the supposedly nonsecret and order disclosure of the latter." 410 U.S. at 84, 93 S.Ct. at 834, 35 L.Ed.2d at 130. The Court concluded that the judiciary's sole function was to decide "whether the President has determined by Executive Order that particular documents are to be kept secret." *Id.* at 82, 93 S.Ct. at 833, 35 L.Ed.2d at 129.

The function of the court was narrow and precise; if the agency controlling the documents averred that the documents were properly classified pursuant to an Executive order, then that would be the end of the matter and the agency's *ipse dixit* could not be judicially scrutinized.

In his concurring opinion, Justice Stewart implicitly invited Congress to amend Exemption 1 and establish procedures which do not "decree blind acceptance of Executive fiat." 410 U.S. at 95, 93 S.Ct. at 840, 35 L.Ed.2d at 137 (Stewart, J., concurring.) Congress accepted the invitation and, in 1974, amended the FOIA so as to legislatively overrule the *Mink* decision. *See* 1974 U.S.Code Cong. and Admn.News, 93rd Cong. 2nd Sess. at 6272.

Two provisions of the 1974 amendments specifically relate to Exemption 1 as interpreted in *Mink*. Section (a)(3) of the FOIA was amended to enable federal courts to conduct *in camera* inspections of documents which are withheld under Exemption 1. The section, as amended, provides:

> On complaint, the district court of the United States . . . has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any

---

1. Executive Order 10501 has been superseded, as of June 1, 1972, by Executive Order 11652 which states in its preamble:

> The interests of the United States and its citizens are best served by making information regarding the affairs of Government

readily available to the public. This concept of an informed citizenry is reflected in the Freedom of Information Act and in the current public information policies of the executive branch. 3 C.F.R. at 339 (1974).

of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. 5 U.S.C. § 552(a)(4)(B).[2]

Section (b)(1) was amended in order to relate textually to the procedural and substantive criteria for the classification of documents as contained in Executive Order No. 11652, 3 C.F.R. at 339 (1974).[3] The statute, as amended, now reads as follows:

This section does not apply to matters that are—

(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order; . . .

President Ford vetoed the amendments declaring them to be an unconstitutional usurpation of the Executive Branch's power and authority to classify documents whose publication could jeopardize national security and foreign policy and, accordingly, as passed, violative of the constitutional principle of separation of powers. His fear was that "[a]s the legislation now stands, a determination by the Secretary of Defense that disclosure of a document would endanger our national security would, even though reasonable, have to be overturned by a district judge who thought the plaintiff's position just as reasonable." 10 Weekly Comp.Pres.Doc. 1318 (1974). De-

spite these fears, Congress overrode the veto and, on February 19, 1975, the law became effective.[4]

Surprisingly, Exemption 1 has been the source of only limited litigation. *Mink, supra; Alfred A. Knopf, Inc. v. Colby,* 509 F.2d 1362 (4th Cir.), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1555, 43 L.Ed.2d 772 (1975); *Schaffer v. Kissinger,* 164 U.S.App.D.C. 282, 505 F.2d 389 (1974); *Epstein v. Resor,* 421 F.2d 930 (9th Cir.), *cert. denied,* 398 U.S. 965, 90 S.Ct. 2176, 26 L.Ed.2d 549 (1970); *Wolfe v. Froehlke,* 358 F.Supp. 1318 (D.D.C. 1973), *aff'd,* 166 U.S.App.D.C. 274, 510 F.2d 654 (1974); *Theriault v. United States,* 395 F.Supp. 637 (C.D.Cal.1975); *Kruh v. General Services Admin. Dept. of Defense,* 64 F.R.D. 1 (E.D.N.Y.1974).

Not surprisingly, .the 1974 amendments have received even less judicial consideration and the scope of Exemption 1, along with its jurisprudential operation, must be determined by it legislative history and purpose.[5] *See generally* Clark, Holding Government Accountable: The Amended Freedom of Information Act, 84 Yale L.J. 741 (1975); Comment, Judicial Review of Classified Documents: Amendments to the Freedom of Information Act, 12 Harv.J. Legis. 415 (1975).

■ The principal purpose of the amendments as they relate to Exemption 1 was stated by Representative Morehead, House

---

2. The original section, which was interpreted in *Mink,* provided:

. . . On complaint, the district court of the United States . . . has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo and the burden is on the agency to sustain its action. 5 U.S.C. § 552(a)(3).

3. Prior to being amended, (b)(1) provided that: (b) This section does not apply to matters that are—

(1) specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy; . . .

4. *See generally* 120 Cong.Rec. H 10864–H 10875 (daily ed. Nov. 20, 1974) (House override by vote of 371 yea, 31 nay, 32 not voting); *id.*

at S 19806–S 19823 (daily ed. Nov. 21, 1974) (Senate override by vote of 65 yea, 27 nay, 8 not voting).

5. Since *Mink,* the Supreme Court has considered five cases which have arisen under the FOIA. *Department of the Air Force v. Rose.* 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11, 44 L.W. 4503 (1976) (Exemptions 2 and 6); *FAA Administrator v. Robertson,* 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975) (Exemption 3); *NLRB v. Sears Roebuck & Co.,* 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975) (Exemption 5); *Renegotiation Board v. Grumman Aircraft Engineering Corp.,* 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975) (Exemption 5); *Renegotiation Board v. Bannercraft Clothing Co.,* 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974).

Manager of the Bill and a Conferee for the House:

> What we are trying to overrule. is the situation described in the famous *Mink* case, where the court said to the Congress, no matter how frivolous or capricious the classification should be, that the court could not go behind it. 120 Cong. Rec. H 10006 (daily ed. Oct. 7, 1974).

The amendments were designed to increase the power of the federal courts to engage in full *in camera* review of an agency's decision that certain documents were properly classified and exempt from public disclosure. The provisions do not, as President Ford feared, give the courts uninhibited power to reclassify documents whenever it disagrees with an agency's decision. As drawn, the amendments require the court to inquire whether the documents withheld under Exemption 1 meet the substantive and procedural criteria of Executive Order No. 11652. *See* 120 Cong.Rec. H 10007 (daily ed. Oct. 7, 1974) (remarks of Representative Morehead).

The original Senate Bill, as proposed by Senator Muskie, *required* federal judges to review *in camera* all documents which were withheld under Exemption 1. *See* S. 1142, 93rd Cong., 1st Sess. § 1 (1973). After much legislative debate and consideration, Congress deleted the mandatory requirement of judicial *in camera* inspection and the final Bill, as passed by both Houses, allows review when the trial judge, in his discretion, deems it to be necessary. *See* 12 Harv.J.Legis., *supra,* at 441 & n. 137 & 138. The Conference Report clearly states that *in camera* inspection should occur only after

the Government has been afforded the opportunity to prove that the documents are clearly exempt from distribution in accord with Executive Order No. 11652. 1974 U.S. Code Cong. and Admn.News, 93rd Cong., 2nd Sess. at 6287–88. So, while the court has the power to order *in camera* inspection, it is a power that is to be used with discrimination.

Representative Morehead suggested that the courts first consider all attendant evidence before ordering *in camera* inspection of the documents. 120 Cong.Rec. H 10865 (daily ed. Nov. 20, 1974).[6] While the burden of proof remains on the Government:

> [T]he conferees recognize that the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects might occur as a result of public disclosure of a particular classified record. Accordingly, the conferees expect that Federal courts, in making *de novo* determinations in section 552(b)(1) cases under the Freedom of Information law, *will accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.* (Emphasis added.) 1974 U.S.Code Cong. and Admn. News, *supra,* at 6290.

A delicate balance must be struck between the Executive's implicit constitutional authority to classify documents in the interests of national security and foreign policy and the Judiciary's explicit constitutional power to interpret the laws of the United States. U.S.Const., art. III § 2. This constitutional conflict between the Ex-

---

**6.** Representative Erlenborn, a Conferee for the House, explained what he deemed to be the purpose and operative procedure of the *in camera* inspection provision as thus:

> First of all, this does allow a court to review what could, and sometimes, I am sure, in the past, has been an arbitrary decision to classify a document for security reasons. This would not require the court to view the material, but would allow the court—and we make this clear in the conference report—allow the court to look at the affidavits from the affected agency, whether the Department of State or the Defense Department or other, and give great weight to these affidavits.

> At that point only, if there was still a question remaining in the mind of the court, the court could conduct an in-camera inspection of the material and see whether it had been properly classified within the terms of the Executive order setting forth the procedure for classification.

> \* \* \* \* \* \*

> Only then would the court have an opportunity to view the material and make a determination as to whether it had been properly classified. 120 Cong.Rec. H 10006 (daily ed. Oct. 7, 1975).

ecutive and Judiciary Branches should not be exacerbated by precipitous action, but can be reduced if neither Branch sanctimoniously acts as if it, and only it, has the "corner on wisdom."

■ In the instant case, the Government has not submitted any evidence which supports or gives credence to its determination that the documents are properly classified. On the contrary, I am somewhat troubled and puzzled as to the NSA's decision that requested Item No. 4 was exempt from disclosure, even though no one ever inspected the document or reviewed its contents.

Congress, in amending the FOIA, made "explicit its agreement with judicial decisions requiring the disclosure of nonexempt portions of otherwise exempt files . . ." *Rose, supra,* 425 U.S. at 373, 96 S.Ct. at 1605, 48 L.Ed.2d at 28, 44 L.W. at 4509. Section 552(b) provides that "[a]ny reasonable segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." In conjunction with this section, 522(a)(4)(B) allows *in camera* inspection "to determine whether such records or *any part thereof* shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action." (Emphasis added.)

I would think that the only way the defendants could adequately determine whether the documents were properly classified pursuant to Executive Order No. 11652 would be by thoroughly examining their contents. Even the most omniscient bureaucrat cannot divine from a document which he has neither seen nor read that all the data contained therein was properly classified and exempt from public disclosure. *But cf., Wolfe v. Froehlke,* 166 U.S. App.D.C. 274, 510 F.2d 654, 655 (1974). It would be difficult for me to give "substantial weight" to an affidavit stating that the documents were properly classified when the averring party, in fact, never saw the documents. Justice may be blind, but she is not bereft of reason.

However, it still remains true from both a procedural and jurisprudential standpoint that "*in camera* inspection of all documents is not a necessary or inevitable tool in every case." *Mink, supra,* 410 U.S. at 93, 93 S.Ct. at 838, 35 L.Ed.2d at 135; *cf. Vaughn v. Rosen,* 157 U.S.App.D.C. 340, 484 F.2d 820 (1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). In view of the sensitive nature of an Exemption 1 claim, I shall not order the immediate production of these documents for *in camera* inspection, but hereby give the defendants thirty days to file with this court detailed affidavits from the agency or agencies controlling these documents, specifying, in particular, the portions of the documents which are exempt and the reasons for their exemption. The affidavits must also specify the substantive and procedural provisions of Executive Order No. 11652 upon which the exemption is based.

I am aware that the defendants' claim that the documents are also exempt under Exemption 3. In particular, they claim that 18 U.S.C. § 798 (prohibiting the release of any classified information concerning communication's intelligence activities) and 50 U.S.C. § 403(d)(3) (prohibiting the release of any information pertaining to intelligence sources and methods) specifically exempt the documents' disclosure.

The Conference Report emphasized that, when intelligence data is subjected to review, "the court should recognize that if such information is classified pursuant to one of the above statutes [42 U.S.C. § 2162; 18 U.S.C. § 798; 50 U.S.C. § 403(d)(3) and (g)], it shall be exempted under [Exemption 3]." 1974 U.S.Code Cong. and Admn.News, *supra,* at 6290.

The principle issue now is whether this court will order an *in camera* inspection of the documents, not whether the documents will be reclassified and released. No court has ever held that an Exemption 3 claim prohibits a court from examining withheld documents. Accordingly, I have not felt it necessary to deal extensively with Exemption 3 at this time.

*Motion for Discovery*

█ Plaintiff alleges that the defendants have denied him access to certain documents because of an alleged agreement with other foreign Governments proscribing their release and claims that the agreement is discoverable under Fed.R.Civ.P. 30 and he seeks its production.

I will not order the production of the agreement at this time. Defendants are given thirty days to submit to this court detailed affidavits stating why this document is not discoverable under Rule 30 or obtainable under the FOIA.