**LAWYERS ALLIANCE FOR NUCLEAR ARMS CONTROL–PHILADELPHIA CHAPTER, and Natural Resources Defense Council**

v.

**DEPARTMENT OF ENERGY.**

Civ. A. No. 88–7635.

United States District Court, E.D. Pennsylvania.

May 30, 1991.

---

Alan D. Berkowitz, Michael J. Salmanson, Dechert, Price & Rhoads, Michael Basch, Fine, Kaplan & Black, Philadelphia, Pa., Janice H. Levin, American Greetings Corp., Cleveland, Ohio, for plaintiffs.

Robert J. Smolski, Asst. U.S. Atty., Philadelphia, Pa., Vincent M. Garvey, Robin D. Ball, Dept. of Justice, Civ. Div., Washington, D.C., for defendant.

## OPINION

GAWTHROP, District Judge.

Plaintiffs, the Lawyers Alliance for Nuclear Arms Control–Philadelphia Chapter, (LANAC) and the Natural Resources Defense Council, (NRDC), brought this action under the Freedom of Information Act, 5 U.S.C. § 552, (FOIA), to compel the defendant, Department of Energy, (DOE), to release specified data on past nuclear-weapons explosions by the United States and the Soviet Union. These data are contained in documents that were prepared and ex-changed by these nations as part of an agreement between them to conduct a joint experiment on verification of nuclear-weapons tests. The DOE has refused release of the documents on the ground that they are classified secret and are exempt from disclosure under FOIA. Before me are motions for summary judgment by both parties. For the reasons that follow, I will deny both motions and order that the case proceed.

## BACKGROUND

The United States and the Soviet Union recently completed negotiations aimed at developing protocols for verification of nuclear-weapons tests. The protocols were sought as a means for the nations to monitor each other's compliance with two earlier agreements placing limitations on nuclear-weapons tests: (1) the 1974 Treaty on Limitation of Underground Nuclear Tests, (the "Threshold Test Ban Treaty" or "TTBT"), signed by President Richard Nixon in 1974 and limiting underground tests to a maximum yield of 150 kilotons; and (2) the Treaty on Underground Nuclear Explosions for Peaceful Purposes, ("Peaceful Nuclear Explosions Treaty" or "PNET"), signed by President Gerald Ford in 1976, and redefining the principles and objectives of the TTBT. At the time the negotiations over protocols were conducted, neither the TTBT nor the PNET had been ratified by the Senate. The Reagan administration, which began the talks on verification, planned to submit the treaties to the Senate for ratification after verification protocols were developed.

In May, 1988, to further the goal of achieving verification protocols, the United States and the Soviet Union agreed to conduct a Joint Verification Experiment, ("JVE"). Under the JVE Agreement, each nation was to make on-site measurements of the yield of a nuclear explosion of the other nation, which would provide technical and physical support to aid the measurements. The nations also agreed to exchange certain seismic, geological, and other data on five previous nuclear explosions conducted by the nations between 1978 and

1987. These historic test data, contained in three documents prepared by the United States and one document prepared by the Soviet Union, were exchanged between the United States and the Soviet Union, in accord with the JVE Agreement, in June, 1988. These documents are what plaintiffs seek in their FOIA request.

In August, 1988, the United States phase of the JVE was conducted at the U.S. test site in Nevada. In September of the same year, the Soviet phase of the JVE took place at the Soviet test site at Semipalatinsk. Negotiations then continued. On June 1, 1990, at a summit in Washington, D.C., President Bush and Soviet President Mikhail Gorbachev signed verification protocols for the TTBT and PNET. The protocols were submitted to the Senate on June 28, 1990, for its consideration, and on September 25, 1990, the Senate gave its approval to the protocols and both treaties. President Bush signed instruments of ratification on December 8, 1990. The treaties and protocols entered into force between the United States and the Soviet Union on December 11, 1990, when signed instruments of ratification were exchanged.

## PROCEDURAL HISTORY

In July, 1988, nearly two years before the United States and the Soviet Union reached an agreement on verification protocols, plaintiffs made their FOIA request for the data exchanged by the nations pursuant to the JVE Agreement. In October, 1988, having received no response, plaintiffs filed this action. In November of the same year, the DOE responded by denying the request, on the grounds that the documents had been classified in their entirety as "Secret–National Security Information", under Executive Order 12356, *reprinted in* 47 Fed.Reg. 14874 (1982). This order authorizes designated executive department officials to classify documents as "secret" if their release could "reasonably ... be expected to cause damage to the national security". *Id.*

In February, 1989, defendant DOE moved for summary judgment. In support of its motion, the DOE submitted affidavits by A. Bryan Siebert, Jr., Director of Classification and Technology Policy for the DOE and Paul Robinson, United States Ambassador to the Nuclear Testing Talks, and head of the United States delegation negotiating the verification protocols. The declaration of Siebert stated that the documents were properly reviewed and classified in accord with Executive Order 12356. The declaration of Robinson explained more fully why release of the documents could be expected to damage national security.

Robinson noted that high-level diplomatic exchanges among nations are generally accorded an implied confidentiality, and that the exchanged JVE data are subject to an express agreement of confidentiality under Document 37 of the Annex to the JVE Agreement. That document provides that information exchanged as a result of the JVE agreement "shall be held in confidence" unless agreement to release of the information is obtained from the other side.[1] Robinson stated that a release of information subject to implied and express conditions of confidentiality would be a breach of agreement and of diplomatic expectations, which would damage the credibility of the United States during a sensitive stage in negotiations, and make the Soviet Union and other nations less likely to trust the United States in future dealings. Robinson also stated that release of information that is a subject of the negotiations would invite public scrutiny and public pressures into the negotiation process,

1. Document 37 of the Annex to the JVE Agreement, entitled "Release of JVE–Related Information", provides in full that:

> *Information produced by either side, pursuant to, or as a result of this Agreement, shall be held in confidence* by both sides subject to the following conditions. *Public release of information* produced by either side pursuant to this Agreement, disclosure or dissemination of such information to other sides, or publication of any material using such information *may take place with the prior agreement of the other side.* After the conclusion of each JVE explosion, each side has the right to issue a general statement on its participation that does not divulge any information produced by either side pursuant to this Agreement.

(emphasis added).

which could limit options available to the United States and upset the balance of bargaining positions.

Plaintiffs moved for a continuance of defendant's summary judgment motion under Fed.R.Civ.P. 56(f), on the grounds that they needed discovery to respond to the affidavits of Siebert and Robinson. By order of November 30, 1989, I granted the continuance and set a deadline for discovery. Before that deadline passed, defendant filed a motion for reconsideration, offering an additional classified affidavit of Paul Robinson, to be reviewed by the court *ex parte* and *in camera*. While recognizing that *ex parte, in camera* review may be appropriate in certain circumstances, *see Patterson by Patterson v. FBI*, 893 F.2d 595 (3rd Cir.1990), I declined such review at that time, again noting plaintiff's lack of opportunity to receive discovery. In the same order, dated March 28, 1990, I ordered the DOE to respond to plaintiff's discovery requests.

Defendant responded by objecting to many of plaintiff's interrogatories. Plaintiffs requested, among other things, (1) information on whether the United States had sought Soviet agreement to release of the JVE data in question or had taken any action to perfect its rights under Document 37; (2) descriptions of communications between the United States and the Soviet Union regarding public release of JVE information; (3) information on the intent of the parties regarding Document 37; and (4) historical information concerning whether the United States had ever negotiated with a foreign power for release of foreign government information that was requested under FOIA. The DOE answered by stating that there has been no agreement between the United States and the Soviet Union under Document 37 for the release of the historic test data, and that the United States is under no legal obligation to seek the consent of foreign powers to the disclosure of information under FOIA. The DOE otherwise objected on grounds of relevancy, burdensomeness, or that the information sought was subject to a states-secret privilege. *See* Plaintiff's Memorandum in Support of its Motion for Summary Judgment, Exhibit A at 5–6.

Plaintiffs thereafter chose not to further press their discovery litigation, filing the cross motion for summary judgment now before the court. In support of their motion, plaintiffs rely on, among other things, an affidavit of Thomas B. Cochran, a Senior Staff Scientist with the NRDC and director of a cooperative program between the NRDC and the Soviet Academy of Sciences on nuclear arms control verification. *See* Amendment to Plaintiff's Memorandum in Support of Motion for a Continuance, Exhibit A. Cochran reports a discussion with Victor Karpov, who was then the Deputy Foreign Minister of the Soviet Union and head of the Administration for Problems of Arms Limitation and Disarmament within the Soviet Foreign Ministry. According to Cochran, Karpov stated that the Soviet delegation to the JVE negotiations suggested to the American delegation that the JVE data in question be made public, but that the American delegation refused. Cochran also reports that Karpov expressed the view that the release of the JVE data by the United States would not breach Soviet expectations regarding the confidentiality of the JVE negotiations. Plaintiff's summary judgment motion was filed after negotiations on verification protocols were completed.

In considering the cross motions for summary judgment, I asked to review the Ex Parte Confidential Declaration of Paul Robinson, previously tendered by defendant to the court, and I did review that document, *in camera*, before issuing this opinion.

### DISCUSSION

The Freedom of Information Act requires each government agency to disclose records in its control upon request of any party if the request reasonably describes the records sought and is made in accord with rules and procedures promulgated by the agency. 5 U.S.C. § 552(a)(3). Disclosure is not required, however, when the records sought fall within any of several statutory exemptions. *See* 5 U.S.C. § 552(b). Among the exemptions is the

so-called "national security exemption" for "matters that are ... (A) specifically authorized under criteria established by an executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).

Plaintiffs do not dispute that the documents here sought were in fact classified as "secret" in accord with procedures established by Executive Order. The issue is whether the classification is substantively proper, that is whether the DOE has sufficient cause to restrict access to the documents in the interest of national security.[2]

Review of an agency's denial of a FOIA request is *de novo*, with the burden on the agency to justify the applicability of an exemption. *See Hayden v. National Security Agency/Central Security Service*, 608 F.2d 1381, 1384 (D.C.Cir.1979). However, when the agency invokes the national security exemption, courts must give deference to agency expertise in exercising *de novo* review. *See American Friends Service Committee v. Department of Defense*, 831 F.2d 441, 444 (3rd Cir.1987). Because executive departments handling defense and foreign policy matters have "unique insights" into the dangers of public exposure, courts are to "accord substantial weight to an agency's affidavits concerning the details of the classified status of a disputed record". *Salisbury v. United States*, 690 F.2d 966, 970 (D.C.Cir.1982) (quoting S.R. 1200, 93rd Cong., 2d Sess. 12 (1974) (conference report) *reprinted in* 1974 U.S.Code Cong. & Admin.News 6267, 6290). Accordingly, summary judgment should be granted for an agency whenever its affidavits (1) " 'describe the withheld information and the justification for withholding with reasonable specificity, demon-

strating a logical connection between the information and the claimed exemption,' " and (2) " 'are not controverted by ... contrary evidence in the record or evidence of agency bad faith' ". *American Friends Service Committee*, 831 F.2d at 444 (adopting standard of D.C.Circuit as stated in *Abbotts v. Nuclear Regulatory Commission*, 766 F.2d 604, 606 (D.C.Cir.1985)).

Plaintiffs argue that the affidavits offered by defendant do not establish a logical connection between disclosure of the historic test data and national security. Defendants counter that national security is implicated on two grounds: first, the disclosure of the historic data would breach an agreement of confidentiality, adversely affecting the ability of the United States to enter future negotiations with the Soviet Union and other countries; second, disclosure of the data could create public pressures, limiting options for United States' negotiators and adversely affecting negotiation strategy with respect to these verification negotiations.

Since the Senate approved the treaties and their protocols, this second concern has become moot. The DOE has admitted as much. *See* Defendant's Reply to Plaintiff's Response to Notice of Recent Development. Thus, this case turns solely on whether the DOE acted properly in refusing to disclose the test data on the ground that such disclosure would constitute breach of the agreement with the Soviet Union.

Ambassador Robinson avers, in his public declarations, that if the United States were to unilaterally release information that is subject to an express agreement of confidentiality with the Soviet Union, the ability of the United States to conduct future negotiations with the Soviet Union or any country would be harmed.[3] Although

---

**2.** In *EPA v. Mink,* 410 U.S. 73, 79, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973), the Supreme Court held that federal courts had no substantive review over agency classification based on the national security exemption, but were limited to determining whether documents were indeed classified as secret under an Executive Order. *Id.* at 82, 93 S.Ct. at 833. Following *Mink,* Congress amended § 552(b)(1), over the veto of then-President Ford, to give courts limited sub-

stantive review over agency classifications. *See Bell v. United States Department of Defense,* 71 F.R.D. 349, 354–356 (D.N.H.1976) (recounting legislative history), *aff'd* 563 F.2d 484 (1st Cir. 1976).

**3.** Robinson also avers that such disclosure would breach the implied agreement of confidentiality that necessarily surrounds high-level diplomatic exchanges. As I find no suggestion

the logic of this suggestion is self-evident, it does not end this court's inquiry. Document 37 of the Annex to the JVE Agreement provides that documents exchanged by the nations can be released by either nation if the advance agreement of the other is obtained. As pointed out by the plaintiffs, it is possible that Soviet agreement to release of the historic test data has already been obtained by the United States. Ambassador Robinson has declared that no agreement on release has been reached between the nations. Yet the absence of a meeting of the minds between the nations may be attributable to United States opposition and not to Soviet opposition.

The DOE argues that it is not required to negotiate for the release of the test data simply because LANAC and NRDC filed a FOIA request. Such a requirement does appear to be beyond the scope of FOIA. The national security exemption of FOIA recognizes that foreign policy issues are to be left to the province of the executive branch. *See American Friends Service Committee,* 831 F.2d at 444. *See also United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 317, 57 S.Ct. 216, 219, 81 L.Ed. 255 (1936) (Constitution places control over foreign policy with the Executive Branch). A requirement that executive agencies affirmatively negotiate for the release of confidential information is not only inconsistent with the apparent purposes of the exemption but may raise constitutional separation-of-powers concerns. It is well settled that Congress may not pass legislation that interferes unduly with the role of the Executive Branch. *See Bowsher v. Synar,* 478 U.S. 714, 726, 106 S.Ct. 3181, 3187, 92 L.Ed.2d 583 (1986); *Morrison v. Olson,* 487 U.S. 654, 694, 108 S.Ct. 2597, 2620, 101 L.Ed.2d 569 (1988). To find that the Freedom of Information Act places certain obligations to negotiate upon United States diplomats would seem to unduly interfere with the President's constitutional authority over treaty negotiation. *See* U.S. Const. art. II, § 2, cl. 2.

Nevertheless, if the Soviet Union has already communicated to the United States its willingness to release the historic test data, nothing remains for the United States to negotiate. The DOE has never averred in any of its public filings that release of the test data itself would present an inherent threat to national security.[4] Rather, contends the DOE, it is the breach of the confidentiality agreement that presents the national security danger. Yet if the Soviet Union has agreed to release, there can be no breach. Under these circumstances, the continued withholding of the historic test data does not preserve diplomatic confidentiality, but allows the DOE to undermine the mandate of FOIA through pretextual bootstrapping.

■ The DOE argues that plaintiffs have not come forward with any admissible evidence that the Soviet Union has communicated a willingness to release the historic test data. Under Rule 56(e), when a party moving for summary judgment offers evidence demonstrating the absence of genuine issues of material fact, the nonmoving party may not rest on its pleadings but must counter with evidence showing there is a material factual issue for trial. Fed.R. Civ.P. 56(e). Although plaintiffs have produced the declaration of Dr. Cochran, which suggests that the Soviets are willing to release the historic test data, the DOE argues that this declaration is hearsay and may not be considered by the court. When addressing a summary judgment motion the court may consider evidence that would not be admissible at trial only if the court finds that the evidence can be reduced to a form that would be so admissible. *See J.F. Feeser, Inc. v. Serv–A–Portions, Inc.,* 909

that this implied expectation is any broader than the specific confidentiality agreement entered into between the nations, I shall treat them as the same.

**4.** In so stating, I make no representation, by implication or innuendo, as to the content of Ambassador Robinson's Confidential Declaration. I do note, however, that in the protracted history of this litigation, the DOE has stated consistently and without exception in its public pleadings that the danger to national security in release of the historic test data is related to a breach of confidentiality and not to the inherent content of the data. It is on this basis that I decide this case.

F.2d 1524, 1542 (3rd Cir.1990); *Williams v. Borough of West Chester*, 891 F.2d 458, 466 n. 12 (3rd Cir.1989). Plaintiffs do not suggest that they can offer this evidence in another form, yet they do argue that it should be considered under the residual exception to the hearsay rule. *See* F.R.E. 803(24); 804(b)(5).

 I need not reach this question, as I find that plaintiffs are presently under no burden to produce. A party responding to a summary judgment motion need not come forward with evidence unless the motion itself is so supported. *See* Fed.R.Civ.P. 56(e); *Adickes v. Kress*, 398 U.S. 144, 155, 90 S.Ct. 1598, 1607, 26 L.Ed.2d 142 (1969). The DOE has offered no evidence that the Soviet Union now opposes release of the data.[5] Thus, under the record as it currently exists, there appears to be a genuine issue of material fact as to whether the Soviet Union has communicated its assent to release of the historic test data.

The DOE contends that this issue is not legally material because the information sought is not subject to discovery; i.e. the DOE suggests that it cannot be required to disclose any knowledge of the Soviet Union's position on release of the data, because such a requirement would force disclosure of information obtained in confidential diplomatic communications, itself a violation of the doctrine of separation of powers. As a general rule, to require diplomats to release the content of their conversations would seriously interfere with their authority to negotiate. Here, however, the inquiry is not to the content of confidential communications, but to whether there are truly expectations of confi-

dence surrounding materials that were exchanged by the negotiators but were not part of the negotiation itself. I do not consider discovery into this threshold question to be a serious interference with the treaty negotiating authority of the Executive Branch.

I find therefore, that neither party is presently entitled to judgment.

---

5. Even if Soviet opposition can be inferred from the fact of the confidentiality agreement, plaintiffs' failure to produce countervailing evidence does not mandate judgment for defendant. Rule 56(f) gives this court discretion to refuse summary judgment if it appears from the affidavits of the opposing party that discovery on an "essential" fact in the possession of the moving party has been requested and not yet received. *Lunderstadt v. Colafella*, 885 F.2d 66, 70 (3rd Cir.1989); *Sames v. Gable*, 732 F.2d 49, 51 (3rd Cir.1984). Although plaintiffs have not formally renewed their original Rule 56(f) motion, *see Lunderstadt*, 885 F.2d at 71 (parties required to file affidavit stating what information is sought,

how it would preclude judgment and why it has yet to be obtained), the Third Circuit has suggested that summary judgment should not be granted while pertinent discovery requests are outstanding unless the failure to abide by the requirements of Rule 56(f) are egregious. *See Sames* 732 F.2d at 52 and n. 3. Here the plaintiffs made their discovery requests and their pertinence known to the court. Plaintiffs chose not to pursue the discovery, thinking they were entitled to judgment on the evidence they possessed. I am unable so to find. Yet I do find that plaintiffs' decision to seek summary judgment should not preclude them from now returning to their discovery requests.